## PETER GABEL v. THE CITY OF HOUSTON.

A motion to quash a writ of *certiorari*, for want of sufficient grounds in the petition, must be made at the first term of the court after the return of the writ. A motion made at a subsequent term will not be entertained. (Paschal's Dig., Art. 468, Note 331.)

If no motion was made in the district court, an objection to the sufficiency of the writ will not be entertained in the Supreme Court.

The Sunday ordinance, under which the proceeding was had, reads as follows: "If any person or persons shall, on Sunday, in any public house, room, building, or inclosure, or in any storehouse or bar-room, in said city, sell,

or furnish for use, any spirituous, vinous, or malt liquors of any kind, such persons shall be deemed guilty of a misdemeanor, and shall pay a fine of not less than $20 nor more than $50, for each and every such offense, to be recovered, with costs, as in cases of other breaches of the city ordinances." The defendant contended that the charter did not give the power to pass this ordinance; and that, if it did, it was unconstitutional. Both propositions were overruled by the court.

The 4th section of the charter of the city confers these powers: "The mayor and city council of the city of Houston shall have full power and authority to make and pass such by-laws or ordinances as they shall deem necessary to maintain the cleanness and salubrity of said city; to secure the safety and convenience of passing in the streets; * * to regulate everything which relates to bakers, butchers, tavern-keepers, or of grog-shops, and other persons keeping public houses; * * and to make other regulations which may contribute to the better administration of the affairs of said corporation, as well as the maintenance of the police, tranquillity, and safety of said city." (3 Session Laws, 85.) This authority is ample for the enactment of the Sunday ordinance.

The enacting the necessary by-laws is an incidental power to a corporation; but these laws must not be inconsistent with the charter, for that is the constitution to the petty legislative body to whom the power to enact by-laws may be delegated.

The language of a charter will be liberally construed, in order to support a by-law which reasonably tends to effect that purpose.

The 3d section of the bill of rights, in the constitution of the Republic, reads as follows: "No preference shall be given by law to any religious denomination or mode of worship over another, but every person shall be permitted to worship God according to the dictates of his own conscience." (Paschal's Dig., p. 41, § 3, Note 154; Paschal's Annot. Const., Note 245, pp. 254–256.)

And the 4th section of the bill of rights of the State constitution of 1845 reads as follows: "All men have a natural and indefeasible right to worship God according to the dictates of their own consciences: no man shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent: no human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion; and no preference shall ever be given by law to any religious societies or mode of worship. But it shall be the duty of the legislature to pass such laws as [may] shall be necessary to protect every religious denomination in the peaceable enjoyment of their own mode of public worship." (Paschal's Dig., p. 47, sec. 4.)

The foregoing city ordinance is not obnoxious to either of these constitutional provisions, but, in fact, it has the effect to protect the inhabitants of the city of Houston in the unmolested enjoyment of the religious privileges, secured by these sections of the bills of rights.

That all people of this country shall have the right to worship God according to the dictates of their own consciences, or not at all, if they prefer, and that government shall not establish any religion for the people to obey, or prohibit the free exercise thereof, appears now to be the settled American doctrine, well established in the organic law of the nation and the States. (Paschal's Annot. Const., Note 245.)

No one here shall be compelled to observe the Jewish, Mohammedan, Catholic, or Protestant form of religion, or to embrace any religion at all. All are free to embrace any religious dènomination, civilized or pagan, which his judgment or taste may dictate as the best or preferable for himself.

The Christian religion has been recognized by our constitution, and the Christian Sabbath observed, not as a habit merely, but as a sentiment of our social organism. (The subject discussed.)

The ordinance does not deny to any citizen or inhabitant any religious privilege or deny any right guarantied by the Constitution of the United States or of this State.

The last clause of the bill of rights (already quoted) makes it the duty of the legislature to pass such laws as may be necessary to protect every religious denomination in the peaceable enjoyment of their mode of worship. This ordinance of the council of Houston is of this character.

APPEAL from Harris. The case was tried before Hon. PETER W. GRAY, one of the district judges.

Peter Gabel was a lager-beer distiller and seller of the beverage in the city of Houston. Peter partook of the notion, quite prevalent among a large and influential·class all over the United States, that whatever may be lawfully done on week days may be done on Sundays; and that all laws restricting the vending of liquors and other drinks on Sunday, and drinking and jollifying over them, are infringements upon liberty and natural right; that they violate the rights of conscience and of religion; and that such laws are an infraction of the Constitution of the United States and of the State, and are void.

The city of Houston was incorporated by an act of the Congress of the Republic, on the 28th January, 1839. (Vol. 3, pp. 84–89.) The 4th section of the charter gives the right to the mayor and common council of the city to regulate everything which relates (among other things) to tavern-keepers, or grog-shops, and other persons keeping public

houses, * * "and to make other regulations which may contribute to the better administration of the affairs of the corporation: *Provided*, That no by-laws or regulations which may have been made by said mayor or city council shall have any force and effect in what may be contrary to the provisions of the constitution of the Republic of Texas." To the mayor and recorder, as justices of the peace, were given the right to try offenses. There were various amendments to the charter, but none of them particularly enlarge the powers of the corporation beyond preserving order and punishing misdemeanors. The Sunday ordinance on which the case turned was fully set out in the opinion of the judge, and it is printed in the syllabus.

Peter Gabel presented his petition to the court, in which he set forth that he had been condemned to pay a fine for violating the Sunday law, which law, he insisted, was unconstitutional and void; and, moreover, insisted that he proved that lager is not "malt liquor;" that it is a harmless beverage, and little or none given to intoxicate; and that the city did not fully prove that lager was "malt liquor," though it was proved that Peter was a lager-beer distiller, and a large purchaser of malt. He said that his condemnation was in violation of the constitution, and contrary to the evidence. The judge granted the *certiorari*, and the case was tried, *de novo*, in the district court. The parties waived a jury and submitted the case to the court. It was proved that on Sunday, 6th March, 1859, Peter sold lager-beer to his guests at his brewery, which was also used as a place of recreation, where various persons were in the habit of resorting on Sunday and other days; that the house was kept in an orderly manner, and in such way as to give no special annoyance to the inhabitants in the neighborhood, or to passers-by, except in one or two instances of quarreling; that the liquor called "lager-beer" is not technically such, though it resembles it and is made of the same materials; that neither lager-beer proper nor

Peter's drinks are "malt liquor," according to its classification in chemistry, or as understood by the manufacturers of liquors; that malt liquors must contain a certain per cent. of malt, which per cent. this liquor does not contain; but that, in common parlance, both lager-beer and porter are called "malt liquors," for, generally, there is a small quantity of malt used in their manufacture; that a kind of beer sold by defendant, and usually called here "lager-beer," may be made without malt, and often is so made, and has been made by defendant, for sale on Sundays, since this proceeding was instituted; that malt has been seen at Peter's brewery, before and after the institution of the prosecution; that he had imported malt for making beer.    One witness testified that he had seen malt at Peter's and other breweries in the process of making beer.    The printed city charter and amendment and the Sunday ordinance were made a part of the record, and they are sufficiently set out in the opinion.

As this case is the first permanent record of a great controversy, which assumed shape in the constitutional convention, and is destined to form no inconsiderable part in the political elements which control society, the judgment of Judge Gray, which gives his reasons, is here copied in full:

"This day came the parties by their attorneys, and waiving trial by jury, and submitted the cause to the court for adjudication on the evidence; and the same having been heard and agreed, because it is considered by the court that the city council, having power delegated by the charter to regulate public houses, grog-shops, hotels, and places of amusement, and to provide for the tranquillity, peace, and order of the city, therefore has the power to pass ordinances restraining the opening of such houses and places on such days as they may reasonably suppose necessary to effect those objects, and to prevent inconvenience and annoyance to the citizens generally, and to that end

to punish a violation of such ordinances by fine, not more than $100, as specified in the charter; that therefore the ordinance in question is valid, except in the sections which refer to the mode and time of trial before the recorder, and which required a jury of less number and different qualifications from the general law of the land, which sections are invalid; and because from the evidence it appears that lager-beer was sold by the defendant on Sunday, as charged, and that it is malt liquor, in the ordinary acceptation of the words; therefore, it is considered and adjudged, that the fine of $20 was rightly assessed against the defendant by the city recorder, and that the plaintiff have and recover the same from defendant, Gabel, and his securities upon the *certiorari* bond, A. J. Charanne and N. Mark, by execution, as in civil suits, together with all the costs in this and the recorder's court sustained; whereupon the defendant by attorney gives notice of appeal."

Peter Gabel was not satisfied with this judgment, and from it he appealed; and after seven years of war he prosecuted that appeal.

*A. P. Thompson*, for the appellant.—It is contended by appellant, that the ordinance was unconstitutional and void, and not authorized by the city charter. This power is not expressly delegated by the charter. Charters of this character must receive a strict construction. The corporation cannot claim it under a power to make by-laws. (Ang. & Ames, on Corp., § 325, 326; 2 Kent Com., 296. For the charter, see Laws of Rep., vol. 3, pp. 83, 89, § 4.)

. The ordinance is evidently an ordinance for the sole purpose of having the Christian Sabbath enforced by city authority; for if the police of the city required such an ordinance, it would require the prohibition of the act on every day. And the authority to pass a Sunday law is nowhere specially delegated. The pretense that it is for general police and good order is a sham.

The constitution forbids the passage of any law on the subject of religion, other than to protect its free exercise, or public worship from interruption. If in favor of Christians a Sunday law can be passed, by parity of reason a Saturday law can be passed for the favor of Jews, and so for other sects.

But such an ordinance is clearly an act of legislation, and belongs to the legislative power. The constitution has conferred this power on the legislature of a State. *Delegatus non potest delegare.*

Whether the legislature has power to pass a Sunday law is a question now before the court in other cases. If the court should sustain the power, it by no means follows that a city corporation can use it, certainly not without express delegation.

*James Masterson,* for the appellee.

SMITH, J.—A motion to quash the writ of *certiorari* for want of sufficient cause in the petition must be made at the first term of the court, and a motion made at a subsequent term will not be entertained. (6 Tex., 234; 12 Tex., 31; 5 Tex., 570.) In this cause no motion was made in the district court to quash, and we think it too late to make objections of that character for the first time in this court.

The defendant below was charged with having sold malt liquors in a public house in Houston, on Sunday, contrary to an ordinance of the city prohibiting it, which reads as follows:

"If any person or persons shall, on Sunday, in any public house, room, building, or inclosure, or in any storehouse or bar-room in said city, sell or furnish for use any spirituous, vinous, or malt liquors of any kind, such person shall be deemed guilty of a misdemeanor, and shall pay a fine of not less than $20 nor more than $50 for each and every such offense, to be recovered with costs, as in cases of other breaches of the city ordinances."

That the defendant did sell malt liquors on Sunday within the city of Houston, in a public house, contrary to the provisions of this ordinance or by-law, we think is sufficiently established. He contends that the ordinance is inoperative and void, because, first, the mayor and city council had no power delegated to them in the charter of the city to enact such a by-law or ordinance; second, that if the charter, in language, does authorize it, expressly or by implication, the law and the ordinance in that respect are both unconstitutional, and therefore void.

So much of the law necessary here to cite, under which the mayor and city council acted, reads as follows, to wit:

"Sec. 4. *Be it further enacted,* That the mayor and city council of the city of Houston shall have full power and authority to make and pass such by-laws or ordinances as they shall deem necessary to maintain the cleanness and salubrity of said city; to secure the safety and convenience of passing in the streets;" * * "to regulate everything which relates to bakers, butchers, tavern-keepers, or of grog-shops, and other persons keeping public houses;" * * "and to make other regulations which may contribute to the better administration of the affairs of said corporation, as well as the better maintenance of the police, tranquillity, and safety of the city."

It has been said that, whenever a corporation is created, the law creating it tacitly, if not expressly, conveys to it the power to make by-laws for its government and support. This power is incidental in the very act of incorporation. It is seldom left to implication, and hence it is sometimes said, that if the charter designate the cases and the purposes for which by-laws may be enacted by the corporation, the power is confined to them, and all others are excluded by implication.

This incidental power of making by-laws results from necessity, to enable the corporation to effect the purposes and objects for which it was created. It being impossible

for human sagacity to discern and make provision for all the varying circumstances attendant upon the operations of the corporation, and hence the necessity of delegating to the corporation the power to make such regulations as may be proper to meet the exigency of the occasion and accomplish the object and purposes for which it was created.

The by-laws must not be inconsistent with the charter. This is the fundamental law of its creation; and, in effect, it is the constitution to the petty legislative body to whom the power to enact by-laws may be delegated. (3 Burr., 1838.)

The language of a charter created for the public good will be construed liberally in order to support a by-law that tends reasonably to effect that purpose.

In this case the language of the charter is, that the mayor and council shall have authority to make by-laws to secure the safety and convenience of passing in the streets, and to regulate everything which "relates to grog-shops and other persons keeping public houses," and to make regulations which may contribute to the better administration of affairs of the corporation, as well as for the maintenance of the police, "tranquillity," and safety of the city. It must·be admitted, that these powers were delegated for the public good of the city of Houston, and should receive a liberal construction in their application to effect the purposes intended; and we are of the opinion that the authority here delegated is ample for the enactment of the ordinance here complained of. It regulates the exercise of the right to sell spirituous, vinous, and malt liquors in public houses in so much only as was reasonably necessary for the tranquillity, good order, and safety of the corporation. It will not be denied that such an ordinance conduces to the good order and tranquillity of a city when it enforces obedience to the rules of sobriety and decency within its limits even more rigorously upon Sunday than other days; for the people, from custom if not from law, desist upon that day

from labor, and observe it as a day of rest, and, if tempted, with the presence of the grog-shop vender of ardent spirits and malt liquors, may fall into the vice of intoxication, and consequent riots, breaches of the peace, and other outlawry, and greatly disturb the peace and tranquillity of the orderly and well-disposed inhabitants of the city upon that day, which should be kept holy, free from vice and worldly pursuits.

The constitution of the Republic of Texas, under which this charter was granted, reads as follows, to wit: "No preference shall be given by law to any religious denomination or mode of worship over another, but every person shall be permitted to worship God according to the dictates of his own conscience."

Section 4, article I, of the State constitution of 1845, reads as follows, viz:

"All men have a natural and indefeasible right to worship God according to the dictates of their own consciences; no man shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent; no human authority ought in any case whatever to control or interfere with the rights of conscience in matters of religion; and no preference shall ever be given by law to any religious societies or mode of worship. But it shall be the duty of the legislature to pass such laws as may be necessary to protect every religious denomination in the peaceable enjoyment of their own mode of public worship."

We are equally well satified that the ordinance complained of is not obnoxious to either of these constitutional provisions, but, in fact, has the effect to protect the inhabitants of the city of Houston in the unmolested enjoyment of these religious privileges, secured by these sections of the constitution of the Republic and State.

That all people of this country shall have the right to worship God according to the dictates of their own con-

sciences, or not at all, if they prefer, and that the government shall not establish any religion for the people to obey, or prohibit the free exercise thereof, appears to be now the settled American doctrine, well established in the organic law of the nation and the States. None here shall be compelled to observe the Jewish, Mohammedan, Catholic, or Protestant form of religion, or to embrace any at all. All are free to embrace any religious denomination, civilized or pagan, that his judgment or taste may dictate as the best or preferable for him.

When we consider the attributes of the Deity and of future rewards and punishments, and the temporal welfare of society, government can hardly consider itself entirely free from the fostering care and protection of religion, as connected with the personal, social, and domestic virtues of its people; but to what extent government may go in the support and protection of religion, with safety and propriety, may be a subject of much contrariety of opinion with statesmen and publicists.

The vast majority of our people profess a belief in the Christian religion, and its existence has been recognized by the constitution framed by them. The followers of that faith have from its earliest existence and foundation regarded and kept Sunday as a day of rest, free from labor and devoted to religious worship. And those not attached to any religious denomination have habitually kept that day as one of rest from secular pursuits; and its observance, as a day of rest and holy, has for centuries become more than a habit or custom: it has become a sentiment, engrafted into our very social organism, to be observed and respected by all, without the sanction of law or decrees of courts. And, as a civil regulation, it has been considered important for the physical well-being of society that Sunday be observed as a day of rest from labor, in order that the mind and body may repose, that the former may recover or retain its wonted elasticity and vigor, and the lat-

ter may recuperate and be prepared for more arduous and protracted exertions in manual labor. And in this view the observance of Sunday, by a suspension of all secular pursuits, may, with great propriety, be enforced by civil law.

The observance of Sunday we believe essential to a full enjoyment of religious exercises by the various denominations, in the spirit of the constitution of the State quoted above. How could a religious set of people worship in a city, crowded with a busy population, and in the midst of the confusion, noise, and bustle of worldly business, and the practices deemed by them unholy, and a sacrilegious desecration of that holy day?

The ordinance complained of does not deprive any inhabitant of the city of Houston of any of the religious rights and privileges guarantied to him in the Constitution of the United States or of this State. The mayor and council did not attempt to fasten upon the people of the city of Houston any particular form of religion—Jewish, Mohammedan, Roman Catholic, Protestant, or pagan; nor has the free exercise of the rites of any religious denomination been forbidden or prohibited in any way. The right to worship God according to the dictation of the conscience has not at all been interrupted; nor is it enjoined upon any inhabitant of the city to attend the religious exercises of any denomination; and he may decline to attend any, and amuse himself with the metaphysical reflections and deductions of the infidel. He is not required to attend, erect, or support any place of worship, or to maintain any ministry, directly or indirectly, contrary to his conscience. His rights of conscience, his religious principles, and practices under them, are not at all infringed or impaired; nor does the ordinance pretend to give any preference to any religion or mode of worship.

The latter clause of the recited section of the State constitution, it will be remembered, provides, that it shall be

the duty of the legislature to pass such laws as may be necessary to protect every religious denomination in the peaceable enjoyment of their own mode of worship.    This ordinance of the council of Houston is believed to be of the character embraced in this clause.    It does not in the least interfere with the religion of any person, or the exercise thereof.    It does not enjoin upon any person the duty of conforming his conduct to the rites·of his church; but it does prevent him from following a tippling occupation in the city on Sunday, by which crowds of persons may be congregated at a public house, and, under the influence of intoxication, may commit riots and breaches of the peace, to the great annoyance of others, who may feel it their religious duty to desist from labor, attend worship, and keep the day holy; and we see a propriety and due respect for the sentiments or customs of our people manifested in the rule that compels a cessation from labor on Sunday, in order that not only man and beast may recuperate, and be restored to health and mental and physical vigor, but that those who, in good faith, may desire to keep that day holy, for the worship of God, may remain undisturbed in the exercise of their religious duties; and any law that tends to this result cannot be considered as repugnant to the constitution.

That there is nothing in the Constitution of the United States or of this State to prevent the legislature from forbidding the pursuit of worldly business upon Sunday has been decided in a number of the States.    (20 Mo., 214; 8 Barr, 326; 3 Serg. & R., 50; 15 Ohio, 230.)    The judgment is

AFFIRMED.