*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0073P (6th Cir.)
File Name: 01a0073p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

AMERICAN CIVIL LIBERTIES
UNION OF OHIO and THE
REVEREND MATTHEW
PETERSON,
     *Plaintiffs-Appellants,*

     *v.*

CAPITOL SQUARE REVIEW
AND ADVISORY BOARD;
ROBERT TAFT, Governor of
Ohio; RONALD R. KELLER,
Executive Director of the
Board; DANIEL
SHELLENBARGER, Assistant
Director of the Board;
RICHARD H. FINAN, Ohio
State Senator; J. KENNETH
BLACKWELL, Secretary of
State; and THOMAS M. ZAINO,
Tax Commissioner,
     *Defendants-Appellees.*

No. 98-4106

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 97-00863—James L. Graham, District Judge.

1

Argued:  December 6, 2000

Decided and Filed:  March 16, 2001

Before:  MARTIN, Chief Judge; MERRITT, NELSON,
BOGGS, NORRIS, SUHRHEINRICH, SILER,
BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY,
and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**    Mark B. Cohn, McCARTHY, LEBIT,
CRYSTAL & HAIMAN, Cleveland, Ohio, for Appellants.
David M. Gormley, OFFICE OF THE ATTORNEY
GENERAL OF OHIO, Columbus, Ohio, for Appellees.
**ON BRIEF:**    Mark B. Cohn, McCARTHY, LEBIT,
CRYSTAL & HAIMAN, Cleveland, Ohio, Susan B. Gellman,
WOLMAN, GENSHAFT & GELLMAN, Columbus, Ohio,
Thomas D. Buckley, Jr., Raymond Vasvari, Jr., ACLU OF
OHIO FOUNDATION, INC., Cleveland, Ohio, for
Appellants.  David M. Gormley, Edward B. Foley, OFFICE
OF THE ATTORNEY GENERAL OF OHIO, Columbus,
Ohio, for Appellees.  Jeffrey S. Sutton, JONES, DAY,
REAVIS & POGUE, Columbus, Ohio, for Amici Curiae
FRANKLIN COUNTY, OHIO, RON O'BRIEN, FRANKLIN
COUNTY PROSECUTING ATTORNEY, and the JEWISH
POLICY CENTER; David R. Huggins, NATIONAL LEGAL
FOUNDATION, Virginia Beach, Virginia, for Amici Curiae
the AMERICAN FAMILY ASSOCIATION OF OHIO,
CITIZENS FOR COMMUNITY VALUES, FAMILY
FRIENDLY LIBRARIES OF OHIO, MEDINA COUNTY
CHRISTIAN COALITION, CHRISTIAN COALITION OF
OHIO, and TRUE BLUE PATRIOTS; John G. Stephanovich
and Shawn A. Voyles, Virginia Beach, Virginia, for Amicus
Curiae the AMERICAN CENTER FOR LAW & JUSTICE
MID-ATLANTIC; Steven K. Green, AMERICANS UNITED
FOR SEPARATION OF CHURCH AND STATE,

offensive. Though the portrait, like school prayers and other sectarian religious rituals and symbols, may seem "de minimis" to the great majority, particularly those raised in the Christian faith and those who do not care about religion, a few see it as a governmental statement favoring one religious group and downplaying others. It is the rights of these few that the Establishment Clause protects in this case.

*Washegesic v. Bloomingdale Pub. School*, 33 F.3d 679, 684 (6th Cir. 1994) *cert. denied*, 514 U.S. 1095 (1995).

Whether by invoking his words or his image, the State should not align itself with Jesus Christ. Yet that is precisely what Ohio has done, in big bronze letters in the Capitol Square. The majority would dismiss this encroachment on religious freedom as merely an innocuous example of civic piety. Nearly two centuries ago, however, James Madison condemned such establishment by increments, observing about one such relatively minor example: "The object of this establishment is seducing; the motive to it is laudable. But is it not safer to adhere to a right principle, and trust to its consequences, than confide in the reasoning however specious in favor of a wrong one." Elizabeth Fleet, *Madison's Detached Memoranda*, 3 Wm. and Mary Q. 534, 555-562 (1946) (*cited in Walz v. Tax Comm'n of New York*, 397 U.S. 664, 684 n.5 (1970)). Today, our Court has been seduced into establishment by increments. Tomorrow will bring another innocuous expression of "civic piety" from Christianity in another city or state on another public building in another public square. Turning Christ's unique message of salvation through grace into a public bumper sticker is not only deeply offensive to many devout Christians. It says to others that their beliefs are inferior and hence turns Christian doctrine into an official state advertising label that discriminates against nonbelievers and other religions that do not accept Christ as their savior.

---

Washington, D.C., and David M. Levine, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, Cleveland, Ohio, for Amici Curiae AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE and THE ANTI-DEFAMATION LEAGUE.

NELSON, J., delivered the opinion of the court, in which BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, COLE, and GILMAN, JJ., joined. CLAY, J. (pp. 42-44), delivered a separate concurring opinion. MARTIN, C. J. (pp. 45-46), and MERRITT, J. (pp. 47-58), delivered separate dissenting opinions, with MARTIN, C. J., DAUGHTREY, and MOORE, JJ., joining in Judge MERRITT's dissent.

---

## OPINION

---

DAVID A. NELSON, Circuit Judge. The First Amendment of the United States Constitution begins with these familiar words: "Congress shall make no law respecting an establishment of religion . . . ." For more than 60 years now, the Fourteenth Amendment has been held to impose a like prohibition on the several states. See *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

In 1959, three years after Congress passed and President Eisenhower signed legislation making "In God We Trust" our national motto, the State of Ohio adopted a similar motto: "With God, All Things Are Possible." Ohio Laws 128 v 252, eff. 10/1/59, codified at Ohio Rev. Code § 5.06.

The plaintiffs in the case at bar initially claimed that Ohio Rev. Code § 5.06 violates both the federal constitutional prohibition against a governmental establishment of religion

and Article I § 7 of the Ohio Constitution.[1]   The state constitutional claim appears to have been abandoned at the trial level, and the district court rejected the plaintiffs' federal Establishment Clause claim.  See *American Civil Liberties Union of Ohio v. Capitol Square Review and Advisory Bd.,* 20 F. Supp. 2d 1176 (S.D. Ohio 1998) (hereinafter "*A.C.L.U.*").

A divided three-judge panel of this court reversed the district court decision, each member of the panel writing separately.  The several opinions of the panel members are reported at 210 F.3d 703 (Cohn, J.), 727 (Merritt, J.), and 730 (Nelson, J.).

After the filing of a petition for rehearing *en banc*, a majority of the active judges of the full court voted to grant rehearing. Under Sixth Circuit Rule 35(a), this had the effect of (1) vacating the judgment which the panel had entered on behalf of the court, (2) staying the mandate, and (3) restoring the case on the docket as a pending appeal.  The full court has now had the benefit of supplemental briefing and oral argument, and the case is ready for final determination.

Upon reconsideration we have concluded that the Ohio motto does not violate the Establishment Clause.   The judgment entered by the district court will therefore be affirmed.

We shall explain our reasoning shortly.  First, however, we turn to a brief summary of the facts.

---

[1] The Ohio Constitution – which begins, interestingly enough, with a sentence expressing the people's gratitude to Almighty God, and § 7 of Article I of which declares "religion," along with morality and knowledge, "essential to good government" – speaks in Art. I § 7 of "a natural and indefeasible right," adhering in all men, "to worship Almighty God according to the dictates of their own conscience."  Section 7 then sets forth detailed provisions designed to ensure that Ohio shall never have a state-established church.  The full text is set forth in note 6, *infra*.

political community.'") (O'Connor, J., concurring) (citation omitted), whereas traditionally public fora remove the State as speaker, *see Capitol Square Review v. Pinette*, 515 U.S. 753 (1995) (allowing a Ku Klux Klan cross, with a disclaimer, on a plaza traditionally open as a public forum).  The presence of an accompanying message can be relevant, *see Allegheny County*, 492 U.S. at 573 (allowing a combined holiday display of a Chanukah menorah, a Christmas tree, and a sign saluting liberty during winter holidays but rejecting as unconstitutional a creche standing alone in the Allegheny county courthouse), as can the availability of secular alternatives, *see id*. at 618 n.67 (Blackmun, J.).  And the history and ubiquity of a traditional sentiment with some religions overtones can be relevant — as seen on every dollar bill, heard before every legislative session, spoken in every pledge of allegiance — neutralizing what would otherwise be expressions of piety.

Taking each of these considerations in turn, we can see how the context of the Ohio motto enhances rather than reduces its Christian content.  The motto is to be placed on government buildings and forms.  It is to be displayed perpetually and alone.  And it does not enjoy pervasive secular use.  Jesus is describing His own God, His Father — not Zeus, nor a Muslim, Hindu, Buddhist, Roman or deist god.  The sum of these factors has before led us to find a violation of the Establishment Clause.  In *Washegesic v. Bloomingdale Pub. School*, we ordered the removal of a portrait of Jesus Christ that had been hanging alone in the hallway of the Bloomingdale Secondary School for the last thirty years.  There, we noted

The defendants argue that the picture has meaning to all religions and that it is not inherently a symbol of Christianity.  The case would be different if the school had placed representative symbols of many of the world's great religions on a common wall.  But Christ is central only to Christianity, and his portrait has a proselytizing, affirming effect that some non-believers find deeply

also in direct conflict with the Ohio Attorney General's own view of the meaning of the motto.

The Ohio motto is not inscribed in a vacuum. Messages carry different meanings depending on the identities of speaker and listener, the setting in which words are spoken, and whether they are accompanied or alone. As we have recognized, "both the content and the context of the religious display must be analyzed, and the constitutionality of a display's effect must be judged, according to the standard of a reasonable observer." *Kunselman v. Western Reserve Local Sch. Dist. Bd. of Educ.*, 70 F.3d 931, 932 (6th Cir. 1995) (holding that the school mascot "Blue Devils" did not violate the Establishment Clause). As Judge Avern Cohn pointed out in his earlier panel opinion in this case, courts have many times "dealt with efforts to read words and phrases out of context." *ACLU v. Capitol Square Review and Advisory Board*, 210 F.3d 703, 724 (6th Cir. 2000). He then quoted Judge Learned Hand:

> Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used, of which the relation between the speaker and the hearer is perhaps the most important part.

*Id.* (*quoting NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941)).

This is a fact-intensive inquiry for which the Supreme Court has mapped broad contours to guide our analysis. In deciding questions of endorsement, the physical space of the message is relevant: religious displays in government areas heighten establishment concerns, *see County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 626-27 (1989) ("The display of religious symbols in public areas of core government buildings runs a special risk of 'mak[ing] religion relevant, in reality or public perception, to status in the

I

The state's current motto (an earlier one, "*Imperium in Imperio*," was revoked by the Ohio General Assembly in 1867) seems to have been the brainchild of a Cincinnati schoolboy named James ("Jimmy") Mastronardo. In the late 1950s Jimmy was encouraged by the then Secretary of State of Ohio, Ted W. Brown, to promote his idea before the General Assembly. (The district court opinion notes that Secretary Brown, "undoubtedly recognizing a chance for some excellent publicity," went so far as to register Jimmy as a "lobbyist." See *A.C.L.U.*, 20 F. Supp. 2d at 1178.)

The lobbying efforts were crowned with success. And when the act adopting the motto was passed by the legislature and signed by the governor, Secretary Brown issued a press release explaining, among other things, that Jimmy "chose a verse in the New Testament, Matthew 19:26 . . . from which to draw the official motto."[2] Pamphlets published by the state to describe Ohio's history, government, and official symbols also identified the source of the motto as Matthew 19:26.

---

[2]Verses 16 through 26 of Chapter 19 of the Book of Matthew tell of a wealthy young man to whom Jesus said this: "If thou wilt be perfect, go and sell that thou hast, and give to the poor, and thou shalt have treasure in heaven: and come and follow me." Unwilling to give up his possessions, the story continues, the man "went away sorrowful." This prompted Jesus to observe to his disciples that "[i]t is easier for a camel to go through the eye of a needle, than for a rich man to enter into the kingdom of God." When the disciples heard this disquieting news, they asked Jesus "Who then can be saved?" It is the response to the disciples' question from which Ohio's motto was drawn: "With men this is impossible," Jesus said, "but with God all things are possible."

The observation that all things are possible with God did not originate with Jesus. (One is reminded in this connection of the words of a much earlier preacher: "there is no new thing under the sun. * * * [T]his is new? it hath been already of old time, which was before us." Ecclesiastes 1:9-10. (Italics omitted)). The sentiment expressed in Ohio's motto is an ancient one, as we shall see presently, and it has been common currency among people of many different cultures and many different faiths.

The motto soon was displayed in conjunction with Ohio's seal – a "completely secular device," as the district court accurately observed –  images of which graced Secretary Brown's letterhead and certain other official stationery and publications. The depiction of the seal itself was not changed, but a ribbon-like device bearing the words of the motto was sometimes added just beneath the seal, encircling its lower half. The Ohio Department of Taxation, among others, joined the Secretary of State's office in using both symbols on its official letterheads and some of its forms.

In 1996 the then Governor of Ohio, George V. Voinovich, recommended to the Capitol Square Review and Advisory Board that the motto be inscribed on the Ohio statehouse. (Governor Voinovich made his recommendation after noticing, on a trip to India, a government building adorned with this thought-provoking legend: "Government Work is God's Work.")  The Board chose to leave the statehouse alone, but decided to replicate both the seal and the motto on bronze flatwork embedded at ground level in the plaza outside the High Street entrance to the statehouse. (The plaza, also known as "Capitol Square," has been described by the Supreme Court as "a 10-acre, state-owned plaza surrounding the statehouse in Columbus, Ohio." See *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 757 (1995)).  The seal-*cum*-motto display was to be ample in scale; its projected dimensions were twelve feet, four inches, by ten feet, nine inches.

The instant lawsuit was filed prior to installation of the seal and motto in the pavement of the plaza. The plaintiffs are the Reverend Mr. Matthew Peterson – an Ohio taxpayer employed as an associate pastor at a Presbyterian Church in Cleveland Heights, Ohio – and the American Civil Liberties Union of Ohio. The defendants include the board, the current governor, and sundry other officials.

The plaintiffs' complaint asserts claims arising under 42 U.S.C. § 1983, the First and Fourteenth Amendments to the

codified in § 5.06 of the Ohio Rev. Code and is "surrounded" by eleven other code sections in which the state adopts as its own various things like the buckeye as the "official tree of this state," the "white tailed deer as the official animal," tomato juice as the "official beverage" and so on.  The majority then infers that Christ's message "with God, all things are possible" has no more religious content than the buckeye, tomato juice or the white tailed deer.

A much more credible interpretation of Ohio's motto is the one given by the defendant Attorney General of Ohio in her letter to constituents of July 26, 2000, written during her reelection campaign.  In that letter Attorney General Montgomery explains that the motto is a meaningful symbol of "faith" and says:

America was founded on faith.

Our great nation is guided by our religious beliefs sustained and strengthened by our spiritual values. . . .

The destruction of our state motto is part of a carefully constructed plan to strip America of every last *symbol of our faith*.

Letter from Betty Montgomery, Ohio Attorney General, to constituents of July 26, 2000 (emphasis added).

To say that Christ's words "with God, all things are possible" is merely a symbol of hope, inspiration and good luck, like the buckeye, is as plausible as saying that the Cross, the symbol of Christ's death and resurrection to save mankind, is not uniquely Christian because crucifixion was a common means of execution in Rome or that the Star of David is not uniquely Jewish because the hexagram also appeared in Islamic art during the Middle Ages.  The majority's simple-minded, secular explanation of Christ's message may upset many devout Christians who take the words seriously and understand their deeper meaning.  It is

of the motto is an irony lost on the majority, but it is an exclusion all non-Christians will come to share whenever they walk past the inscription on Capitol Square and wherever else it will now appear.

Instead of analyzing the meaning of the motto in terms of God's power and salvation through grace, the majority seeks to justify the motto as secular on the grounds that Jesus "was not saying anything new" but "was simply using a proverbial phrase that was commonly known and accepted as true" by Jews of the time. In support of the secular nature of the motto, the majority then makes the same point that Pennsylvania made in trying to justify the reading of daily Bible verses in school in *Abington v. Schempp*, 374 U.S. 203 (1963). Pennsylvania said the Bible reading was secular because it "instill[ed] morality." Likewise, Judge Nelson's opinion justifies Ohio's use of Jesus' words because "the Bible has become a moral as well as religious source of insights in our Western culture." The Supreme Court has expressly rejected this justification under the Establishment Clause. When Pennsylvania asserted that its secular purpose in requiring ten Bible verses to be read to begin the school day was to "instill morality," the Supreme Court held that this justification was simply a pretext for endorsing Christianity. *Id*. at 223-25. "Readings from the speeches and messages of great Americans, for example, or from the documents of our heritage of liberty" would serve the purpose, and would be regarded as "unsatisfactory or inadequate only to the extent that the present activities do in fact serve religious goals," *Id*. at 280 (Brennan, J., concurring). Likewise, in the case of the Ohio motto, any number of other phrases exhorting Ohioans to greater achievements would serve the same purpose — except they would contain no Christian message.

Finally, in one of the most remarkably creative passages in all Establishment Clause jurisprudence, the majority explicitly relies on the canon of construction *noscitur a sociis* ("it is known from its associates" Black's Law Dictionary 1060 (6th ed. 1990)). The Court advises us that the state motto is

Constitution of the United States, and Article I § 7 of the Ohio Constitution. The plaintiffs conclude their pleading with a prayer for relief in which they seek, among other things, an injunction to prevent the motto from being displayed on the plaza, or elsewhere on the statehouse grounds, or on the statehouse itself; a declaration that Ohio Rev. Code § 5.06 is unconstitutional; an injunction against any future use of the words "With God All Things Are Possible" as the state motto; and an award of costs and attorney fees. The parties have stipulated to an order preventing installation of the display on Capitol Square pending disposition of the lawsuit.

Following a trial, the district court issued the decision now being challenged here. While concluding that the motto *per se* is not unconstitutional, and thus declining to enjoin its use on Capitol Square or elsewhere, the district court did enjoin the state "from attributing the words of the motto to the text of the Christian New Testament." See *A.C.L.U.*, 20 F. Supp. 2d at 1185. The state has not appealed this injunction, and we intimate no view as to whether the issuance of such an order was error.

II

As evidenced by the dissents herein, as well as by the lead and concurring opinions of the members of the original three-judge panel, this is not necessarily an easy case. We think it would be quite an easy case, however, if the constitutional prohibition against the enactment of legislation "respecting an establishment of religion" were to be read as meaning what it seems to have meant when the Bill of Rights (which includes the First Amendment, of course) was added to the federal Constitution. It would be an equally easy case, for that matter, if the prohibition were read as meaning what it seems to have meant when the Fourteenth Amendment was adopted, or when the Fourteenth Amendment was first held to extend the strictures of the Establishment Clause to the individual states.

A

For most of our history as an independent nation, the words of the constitutional prohibition against enactment of any law "respecting an establishment of religion" were commonly assumed to mean what they literally said. The provision was not understood as prohibiting the state from merely giving voice, in general terms, to religious sentiments widely shared by those of its citizens who profess a belief in God. As Justice William O. Douglas famously said, speaking for the Supreme Court in a decision handed down some 12 years after the decision in *Cantwell v. Connecticut* – and only seven years before adoption of the Ohio motto – "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). And as the Supreme Court pointed out as recently as 1984, "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

Whatever else may have been understood to be prohibited with the adoption of the First Amendment's Establishment Clause,[3] it is clear that the principal thrust of the prohibition was to prevent any establishment by the national government of an official religion, including an established church such as that which existed in England at the time the American colonies won their independence from the Crown. The Church of England, as Chief Justice John Marshall explained in *Town of Pawlet v. Clark*, 13 U.S. (9 Cranch) 292, 325 (1815), had been given "peculiar rights and privileges, not as a corporation, but as an ecclesiastical institution under the

---

[3] Speaking through the late Chief Justice Warren Burger, the Supreme Court observed in a case decided 30 years ago that "[a] given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971).

obvious primary, and literal, meaning of the words is that a personal, all-knowing, all-powerful God intervenes in the daily affairs of individuals and through this miracle of supernatural intervention makes "all things possible" — including the Christian rewards of salvation, rebirth and eternal life in heaven. Although some Christian sects take this view of God's power as literally true, many other religious people do not. In addition, many skeptics and nonbelievers do not agree that God's power to intervene is so great that He makes "all things possible." The *Scientific American* has reported a survey of the 1800 members of the National Academy of Sciences which shows that over 90% of the Academy — created by Congress in 1863 — does not believe in a personal God who intervenes in the affairs of human beings. E. Larson and L. Whitham, *Scientists and Religion in America*, Scientific American (Sept. 1999).

Despite the insistence of the majority to the contrary, the motto does more than pay "lip service" to the power of God. It does more than "irritate" people. It has the capacity to alienate citizens of Ohio, to create in-groups and out-groups on the basis of their identification with and knowledge of the words of Jesus as contained in the New Testament. That the rabbi, as a non-Christian, could not identify the exact origins

---

Then said Jesus unto his disciples, Verily I say unto you, That a rich man shall hardly enter into the kingdom of heaven.

And again I say unto you, It is easier for a camel to go through the eye of a needle than for a rich man to enter into the kingdom of God.

When his disciples heard it, they ere exceedingly amazed, saying, Who then can be saved?

But Jesus beheld them, and said unto them, *With men this is impossible; but with God all things are possible.*

Matthew 19:21-26 (King James version) (emphasis added).

practices that are seemingly universal in nature, or whose sectarian origins can be obscured?

Judge Graham in the court below enjoined the State of Ohio from citing Matthew 19:26, attributing the quote to Jesus, or making any reference to the undeniable religious origins of the motto. The need to enjoin any reference to the biblical source of the Ohio motto demonstrates the vast difference between it and the national motto. It is tantamount to an admission of unconstitutionality. Noting that this aspect of the case was not appealed, the majority never confronts the fact that the injunction is a tacit recognition of the Christian nature of the phrase. Although we are not told what constitutional provisions require or permit such an injunction, the thought seems to be that the religious motive and content of the Ohio motto can somehow be obliterated by removing the quotation marks. This notion is as offensive as it is mistaken. As demonstrated by Matthew Peterson, a Presbyterian pastor and one of the plaintiffs in this case, Ohio is debasing a deeply held Christian message into greeting card banality. Suppressing Christ as the witness to God's efficacy in this world and yet enshrining his words in the state motto is spiritual plagiarism for the sake of a better-looking tax form.

Ignoring the identity of the speaker and focusing on the content of the message, Judge Nelson's opinion for the Court completely overlooks the fact that Ohio's biblical motto describes how to achieve salvation through God's grace. Even if we remove the quotation from its immediate biblical setting, eliminating the rich man story about salvation and the prospect of entering the kingdom of heaven,[3] the most

---

[3] Jesus said unto him, if thou wilt be perfect, go and sell that thou hast, and give to the poor, and thou shalt have treasure in heaven; and come and follow me.

But when the young man heard that saying, he went away sorrowful; for he had great possessions.

patronage of the state." And from the time of Henry VIII onward, the "head of the church [had been] the head of the State." See *Melvin v. Easley*, 52 N.C. 356, 360 (N.C. 1860). Our 18th Century English cousins were subject to being taxed by their government for the financial support of the established church; Englishmen were barred from serving in Parliament or teaching at the universities if they did not profess adherence to the religious tenets of the established church; and non-adherents were otherwise exposed to a rather impressive array of pains and punishments. An example mentioned in *Gass v. Wilhite*, 32 Ky. 170, 176 (Ky. 1834), is that English courts "disallowed trusts in favor of the Catholic or Jewish religion, as inimical to the established religion. . . ."

All this was flatly prohibited, at the federal level in the United States, when the representatives of the American people ratified the First Amendment. Mr. Justice Story summed it up with his customary precision when, in discussing the Establishment Clause of the Virginia Constitution, he observed that "the legislature could not create or continue a religious establishment which would have exclusive rights and prerogatives, or compel the citizens to worship under a stipulated form of discipline, or to pay taxes to those whose creed they could not conscientiously believe." *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43, 49 (1815).

Story's use of the verb "compel" is significant – for an element central to the original understanding of "an establishment of religion" was that of *coercion*. Writing in 1791– the same year in which the First Amendment was ratified – Thomas Paine observed that "religions established by law" always have the "strongly marked feature" of state-sanctioned "persecution." Thomas Paine, *The Rights of Man*, pt. 1 (1791) (reprinted in 5 *Founders' Constitution* 95, 96 (Philip B. Kurland & Ralph Lerner eds., 1987), hereinafter "*Founders' Constitution*"). In the congressional debate over ratification, similarly, James Madison – the Father of the First Amendment – said that he "apprehended the meaning of the [Establishment Clause] to be, that Congress should not

establish a religion, and *enforce* the legal observation of it by law, nor *compel* men to worship God in any manner contrary to their conscience." 1 *Annals of Cong.* 758 (Gales & Seaton's ed. 1834) (Aug. 15, 1789) (emphasis supplied). Madison noted that some of the conventions called to ratify the original Constitution had been concerned that Congress' power under the Necessary and Proper Clause might have "enabled them to make laws of such a nature as might infringe the rights of conscience, and establish a national religion; to prevent these effects he presumed the amendment was intended . . . ." *Id.* Madison added that he "believed that the people feared one sect might obtain a pre-eminence, or two combine together, and establish a religion to which they would *compel* others to conform." *Id.* (Emphasis supplied.)

Madison's understanding is further illuminated by the message he sent Congress during his presidency to explain his veto of an act incorporating an Episcopal church in Alexandria, Virginia. The message argued that the statute would violate the Establishment Clause insofar as it "establishes by law, sundry rules and proceedings relative purely to the organization and polity of the church incorporated, and comprehending even the election and removal of the Minister of the same . . . ." 11 *Annals of Cong.* 982 - 83 (Feb. 21, 1811). Madison also complained that the church regulation would "be enforced by the penal consequences applicable to a violation of them according to the local law." *Id.* at 983.[4]   In this, Madison's most

---

[4]In 1828 the New Jersey Supreme Court considered a case involving a question of who was to be allowed to vote in the selection of trustees for a certain Presbyterian church. In an eminently Madisonian decision, the court held that the church should be accorded complete discretion in deciding who its members were, because "if the civil power prescribed rights of membership at all, it would naturally accommodate them to such doctrine, discipline and government as were most conformable to its own faith; which is the very groundwork of a religious establishment." *State v. Crowell*, 9 N.J.L. 390, 418 - 19 (1828). Similarly, the Louisiana Supreme Court observed a few years later that a legislature "could not constitutionally declare, what shall constitute a curate in the Catholic

## II.

In response to our dissenting opinion, the majority and Judge Clay in his separate concurrence have simply stated again, but more vehemently, that Jesus' words to his disciples, "with God, all things are possible," are in no way different from "In God We Trust" found on the coin of the realm. They harp on this argument over and over.

Although I do not concede that the national motto passes the non-endorsement test of the Establishment Clause, I should emphasize that there is a vast constitutional difference between the two. While the phrase "In God We Trust" refers broadly to a shared human yearning for the spiritual, the Ohio motto conveys a sectarian view of God as interventionist, active, and omnipotent. The national motto does not specify a personal, all-powerful, all-knowing God who makes "all things possible" by intervening in daily affairs. The God in whom we trust could be the god of Jefferson's deism or even the laws of science or the cosmology of Newton or Einstein. It does not define the god of any religion. The god of the silver coin and the dollar bill — "In Whom We Trust" — may be drawn from any of the gods of the world's vast pantheon of divinity that has accumulated from Greek times to the present.

The majority accuses us of "draw[ing] [an] exquisitely fine distinction[]" between the national motto and the Ohio motto. The distinction is neither fine nor exquisite. It is crucial. It is a perilous step between these two mottoes—from an anomalous adoption of a carefully drawn non-sectarian statement of spirituality and religiosity to the adoption by a government of an explicitly sectarian teaching of faith. The majority would—wittingly or not—allow the national motto to become a shield for a vast array of government-sponsored religious activity. If the Ohio motto stands because it is analogous to the national motto, then what is to stop our governments from adopting any other sectarian teachings or

some version of Judge Nelson's narrow historical view of the Establishment Clause, *see Santa Fe Independent School District v. Doe*, 530 U.S. at 320 (Rehnquist, C.J., dissenting, joined by Scalia and Thomas, JJ.),[2] this is not the Court's majority position. The six other justices have adopted the position that "government speech endorsing religion" is also forbidden. *Id*. at 310. In *Wallace v. Jaffree*, 472 U.S. 38 (1985), the Court struck down an Alabama statute that required a moment of "prayer and meditation" for students in the state school system. In her concurrence, Justice O'Connor suggested that appropriate test for such questions was "whether government's purpose is to endorse religion and whether the statute actually conveys a message of endorsement." *Id*. at 69 (O'Connor, J., concurring). This standard was later adopted by the six-justice majority in *Santa Fe Independent School District*, 530 U.S. at 312, which set forth the "endorsement of religion" test that controls the case now before our court. This test gives teeth to the Supreme Court's general directive that we should be particularly wary of government sponsored religious expression:

> Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious beliefs or from "making adherence to a religion relevant in any way to a person's standing in the political community."

*County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 593-94 (1989) (citing *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)).

[2]In addition, it is important to note that the minority view of the Establishment Clause is still broader than Judge Nelson's narrow perspective, in that it recognizes that the Establishment Clause was "also designed to stop the Federal Government from asserting a preference for one religious denomination or sect over others." *Wallace*, 472 U.S. at 113 (Rehnquist, J., dissenting).

"separationist" pronouncement as President, the objections that were set forth dealt not with any governmental acknowledgment of religion, but with governmental involvement in the promulgation and enforcement of church regulations.

Two 18th-Century documents that shed a good deal of light on the original understanding of the Establishment Clause are Madison's *Memorial and Remonstrance Against Religious Assessments* (reprinted in full at *Everson v. Board of Educ.*, 330 U.S. 1, 63-72 (1947)) and Jefferson's *Bill for Establishing Religious Freedom,* which became law with its enactment by the Virginia General Assembly – after a struggle lasting about a decade – in 1786. Both of these documents clearly reflect an understanding of religious establishments as entailing *coerced* observance of, or monetary support for, a religion or religions.

Madison's *Memorial and Remonstrance* argues that governmental support for Christian ministers would be a "dangerous abuse" if "armed with the sanctions of a law;" that government should not "force a citizen to contribute" to "the support of a church;" and that "compulsive support" of religion is "unnecessary and unwarrantable." James Madison, *Memorial and Remonstrance Against Religious Assessments* (reprinted in 5 *Founders' Constitution* 82). One prominent scholar has summarized Madison's thoughts by saying that "legal compulsion to support or participate in religious activities would seem to be the essence of an establishment." Michael W. McConnell, *The Origins of the Religion Clauses of the Constitution: Coercion, the Lost Element of Establishment*, 27 Wm. and Mary L. Rev. 933, 938 (1986).

acceptation of the word, without interfering in matters of religious faith and worship, and taking a first step towards a church establishment by law." *Wardens of the Church of St. Louis v. Blanc*, 1844 La. LEXIS 96, *65, 8 Rob. 51, 83 (La. 1844).

Jefferson's *Bill*, similarly, reflects the understanding that a religious establishment entails governmental attempts (a) to influence religious belief "by temporal punishments or burthens, or by civil incapacitations," (b) to "impose" religious beliefs on others, (c) to "compel a man to furnish contributions of money for the propagation of opinions which he disbelieves," and (d) to "proscrib[e] any citizen as unworthy the publick confidence . . . unless he profess or renounce this or that religious opinion . . . ." Thomas Jefferson, *A Bill for Establishing Religious Freedom* (June 12, 1779) (reprinted in 5 *Founders' Constitution* 77). At the heart of Jefferson's *Bill* is this passage:

> "We the General Assembly of Virginia do enact that no man shall be *compelled* to frequent or support any relig[i]ous Worship place or Ministry whatsoever, nor shall be *enforced, restrained, molested, or burthened* in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief, but that all men shall be free to profess, and by argument to maintain their opinions in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities." *Id.* (Emphasis supplied.)

While taking direct aim at state compulsion of religious observance, Jefferson's *Bill* voiced no objection at all to official acknowledgment of a Higher Being. On the contrary, the *Bill*'s very preamble asserts that "Almighty God hath created the mind free, and manifested his Supreme will that free it shall remain . . . ." *Id*. Jefferson frequently referred to the Creator, of course – the Declaration of Independence springs to mind in this connection ("all Men . . . are endowed by their Creator with certain unalienable rights") – and Jefferson's well known letter to the Danbury Baptists (the document in which Jefferson coined the phrase "wall of separation between church and state") asked the Baptists for their "kind prayers for the protection and blessing of the common Father and Creator of man." Thomas Jefferson,

"no law *respecting* an establishment of religion." A law may be one "respecting" the forbidden objective while falling short of its total realization. A law "respecting" the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not *establish* a state religion but nevertheless be one "respecting" that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment.

*Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (emphasis in original).

Even viewing the majority's state-church theory in its most favorable light, the historical evidence does not support the idea that forbidding a state church was the Founders' only purpose. James Madison, the draftsman and the guiding hand behind the Establishment Clause, and upon whom the majority relies, was himself concerned that "religious and political coalitions" endorsing Christianity would develop in the new republic. IX The Writings of James Madison, 487 (G. Hunt ed. 1910). He believed that the prohibitions contained in the Establishment Clause would be necessary to deter the government and religious sects from the "tendency to a usurpation on one side or the other, or to a corrupting coalition or alliance between them." *Id*. In the Congressional debates surrounding the passage of the Establishment Clause, Madison's colleague Elbridge Gerry proposed that the Clause would prohibit much more than a state church or compelled worship. According to Gerry, the Establishment Clause would ensure that "no religious doctrine [not simply a state church] shall be established by law." 1 Annals of Cong. 729.

The majority's lengthy discourse on the state-church view of the Establishment Clause — a view that even the majority opinion halfway admits is not the controlling law — has so clouded the majority's judgment that it is unable to properly apply the endorsement test. Although a three-member minority of the current Supreme Court appears to subscribe to

to strive." We will take up the Court's two main points in turn.

## I.

The Establishment Clause forbids much more than the state church that the majority discusses at length. It also forbids prayer in public schools, prayer at graduation and high school football games, religious creche sets on the public square, posting the Ten Commandments in public schools and other public places, using public funds to support religious schools, banning the teaching of evolution, requiring creationism to be taught, and other similar efforts to advance Christianity.[1] For at least 30 years, the Supreme Court has made it clear that the Clause is much broader in scope than the majority of our Court believes:

The language of the Religion Clauses of the First Amendment is at best opaque, particularly when compared with other portions of the Amendment. Its authors did not simply prohibit the establishment of a state church or a state religion, an area history shows they regarded as very important and fraught with great dangers. Instead they commanded that there should be

---

[1] *See Wallace v. Jaffree*, 472 U.S. 38 (1985) (prayer in schools); *Lee v. Weisman*, 505 U.S. 577 (1992) (forbidding school-initiated prayer at graduations); *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000) (same at high school football games); *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989) (displaying religious creche sets on a public square); *Stone v. Graham*, 449 U.S. 39 (1980) (posting the Ten Commandments in public schools); *Board of Education v. Nyquist*, 413 U.S. 756 (1973) (using public funds to support religious schools); *Epperson v. Arkansas*, 393 U.S. 97 (1968) (banning the teaching of evolution in state-funded academic institutions); *Edwards v. Aguillard*, 482 U.S. 578 (1987) (requiring creationism in public school curricula). *See also, e.g., Larkin v. Grendel's Den*, 459 U.S. 116 (1982) (striking down a Massachusetts statute granting churches veto rights over applications for liquor licenses within 500 feet of the church); *Texas Monthly v. Bullock*, 489 U.S. 1 (1989) (holding that a tax exemption granted only to religious periodicals violates the Establishment Clause).

---

Letter of January 1, 1802, in 16 *Writings of Thomas Jefferson* 281-82 (1904).

If the Establishment Clause of the First Amendment had been understood by its authors to prohibit the government from expressing sentiments of the sort contained in the Ohio motto, as opposed to prohibiting even the first step toward an "establishment" of religion in the conventional sense of that term, some of the behavior of the First Congress would have been utterly inexplicable. It has often been noted, for example, that the First Congress, promptly after its ratification of the First Amendment, called upon President Washington to proclaim a national "day of public thanksgiving and prayer to be observed by acknowledging with grateful hearts the many signal favors of Almighty God." See George Washington, *Proclamation: A National Thanksgiving* (reprinted in 5 *Founders' Constitution* 94).[5] Both houses of the First Congress also instituted the practice of opening each day's legislative session with a prayer delivered by a chaplain who was employed – and paid – by the government. See *Lynch*, 465 U.S. at 674, and *Marsh v. Chambers*, 463 U.S. 783, 787-88 (1983). (It should be noted, however, that Madison opposed the congressional chaplaincy on establishment grounds. See James Madison, *Detached Memoranda* (c. 1817) (reprinted in 5 *Founders' Constitution* 103, 104).) And finally, in an irony of history that did not escape the notice of the district judge in the case at bar, the First Congress reenacted the enormously important Northwest Ordinance, 1 Stat. 50, on the very day it approved the Establishment Clause. See *A.C.L.U.*, 20 F. Supp. 2d at 1184.

---

[5] In 1814 President Madison issued a similar proclamation, setting aside January 12, 1815, as a day of offering "humble adoration to the Great Sovereign of the Universe." James Madison, *Proclamation* (Nov. 16, 1814) (reprinted in 1 James D. Richardson, *A Compilation of the Messages and Papers of the Presidents, 1789 - 1897*, at 558 (1896)).

Article III of the Northwest Ordinance begins by listing "[r]eligion," followed by "morality" and "knowledge," as "*necessary to good government . . . .*" (Emphasis supplied.)[6]

_____

[6]The full sentence – the text of which has been inscribed on the gateway to the grounds of the Ohio University, in Athens, Ohio – reads as follows: "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." No one, as far as we know, has ever demanded that the Ohio University inscription be obliterated on the theory that it is a precursor of an "establishment" of religion.

As we have already seen, the proposition that religion, morality, and knowledge are necessary to good government was to be echoed in Article I § 7 of the Constitution of Ohio. That section, which contains the Ohio counterpart to the federal Establishment Clause, is worth quoting in full for the light it sheds on the 19th Century's understanding of what is actually entailed in laws respecting an establishment of religion:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted. No religious test shall be required, as a qualification for office, nor shall any person be incompetent to be a witness on account of his religious belief; but nothing herein shall be construed to dispense with oaths and affirmations. Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the general assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction."

Nineteenth Century minds saw no inconsistency, of course, between adopting a Constitution that prohibited a governmental establishment of religion and introducing the same Constitution with a preamble reading, in Ohio's case, as follows: "We, the people of the State of Ohio, *grateful to Almighty God* for our freedom, to secure its blessings and promote our common welfare, do establish this Constitution." (Emphasis supplied.)

Lest it be thought that Ohio was an unusually ardent hotbed of

_____

## DISSENT

_____

MERRITT, Circuit Judge, dissenting. At the outset, we should keep firmly in mind that for more than 50 years, Ohio has expressly informed its citizens in many ways — in the law itself and in its legislative history and in various state publications and on tax returns and other state official forms — that its motto recites the message of Jesus in Matthew 19:26. That is not, as the Court seems to suggest, a secret kept from the citizens of Ohio. The state is now proceeding to display Christ's message of salvation in stone and bronze on state structures and in public squares. The religious motto may soon be made to appear on friezes above entrances of state buildings, just as Governor Voinovich proposed in 1996 as he was running for election to the Senate, and it may soon appear in legislative and judicial chambers as a symbol of Ohio as a religious state dedicated to Christ's teachings.

Judge Nelson's opinion for the Court approves Ohio's adoption of Christ's words. In doing so, the Court makes two basic mistakes in interpretation. *First*, through selective quotations of 18th and 19th Century "historical evidence," the Court spends the first half of its analysis trying to show that the Establishment Clause means only that the government may not itself — in the words of Justice Storey taken from *Torrett v. Taylor*, 13 U.S. (9 Cranch) 43, 49 (1815) — formally "create or continue" a state church and "compel citizens to worship" there "or to pay taxes" in support of the state church, as was the case with the Church of England and the Episcopal Church in 18th Century Virginia. *Second*, the Court spends the remaining half of its opinion trying to show that Christ's message about God's power and man's salvation represents no more than an innocuous "secular aphorism" for "boosting morale, instilling confidence and optimism, and exhorting the listener or reader not to give up and to continue

(citing JAMES MADISON, MEMORIAL AND REMONSTRANCE AGAINST RELIGIOUS ASSESSMENTS (1785), in 8 Papers of James Madison 301 (W. Rachal, R. Rutland, B. Ripel, & F. Teute eds., 1973)).

When Jesus' key to eternal salvation is lumped in the Ohio statutes with the Buckeye tree and tomato juice, the signal sent is that religion is no more important than those two nice but ultimately inconsequential things. To many, religion is much more important, perhaps the most important force in their lives. I fear that Ohio has given Christianity a crutch it is better left without. I respectfully dissent.

What we believe the actions of the First Congress demonstrate, in sum, is this: that to men active in public affairs when the First Amendment was adopted, the Establishment Clause meant just what it said. (For a conflicting view, see Leonard W. Levy, *Original Intent and the Framers' Constitution*, 179 (Macmillan, 1988)). A modern scholar puts the substantive point thus:

"In approving the establishment clause, the framers had adopted a principle of *institutional* separation, but they had neither undertaken to impose a secular political culture on the nation nor consented to abandon their own religious values and culture when serving as public officials. Indeed, any such undertaking would have required a seemingly impossible intellectual and psychological surgery. Proclaiming a national day of thanksgiving, or inviting a chaplain to offer a prayer before congressional sessions, were actions of undeniable religious import. But through those actions the government did not intrude into the internal affairs of any church. Nor did these actions confer governmental authority upon churches; Congress did not endow the chaplain with authority to debate, vote, or directly influence governmental decisions. Hence, thanksgiving proclamations and legislative prayers were simply not inconsistent with the decision reflected in the

---

religious enthusiasm, we hasten to point out that the preambles to the constitutions of no fewer than 43 other states likewise refer in one way or another to a Supreme Being. (The states in question are Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Washington, West Virginia, Wisconsin, and Wyoming.) Of the six state constitutions that do not contain a preambular reference to God, three – New Hampshire's, Virginia's, and Vermont's – have establishment clauses that themselves refer explicitly to God or speak approvingly of religion.

establishment clause." Steven D. Smith, *Separation and the "Secular": Reconstructing the Disestablishment Decision*, 67 Tex. L. Rev. 955, 973 (1989) (footnotes omitted).

Throughout the 19th Century – in the latter half of which, to repeat, we added the constitutional framework for extending the First Amendment to the individual states – the prevailing view of the Establishment Clause was informed by the understanding prevalent when the original Constitution and the Bill of Rights were adopted. A typical 19th Century judicial decision thus defined an establishment of religion in these terms: "law makers have undertaken to declare what is the true faith, and to prescribe which is the rightful worship, and either prohibit all others as unlawful, or tolerate them merely out of indulgence to human frailty." *Holland v. Peck*, 37 N.C. 255, 258 (N.C. 1842). (The North Carolina court added that although that state's constitution prohibited the establishment of religion, it "does not hence follow that religion is less the object of public veneration and regard with us, than in those countries where a church is established by law, but that the State disclaims the right of pronouncing what church is orthodox, and extends its protection equally to every religious church and every religious denomination." *Id.* at 259.)[7]

In a Texas case involving the constitutionality of a blue law, similarly, the court, after noting that the government could not "establish any religion for the people to obey," observed that "[w]hen we consider the attributes of the Deity and of future rewards and punishments, and the temporal welfare of society, government can hardly consider itself

---

[7] As is suggested by this reference to "the State disclaim[ing] the right of pronouncing what church is orthodox," Justice Rehnquist, as he then was, blazed no new trail in making the point that "[t]he [Establishment] Clause was also designed to stop the Federal Government from asserting a preference for one religious denomination or sect over others." *Wallace v. Jaffree*, 472 U.S. 38, 113 (1985) (Rehnquist, J., dissenting).

---

## DISSENT

---

BOYCE F. MARTIN, JR., Chief Judge, dissenting. I join the dissent of Judge Merritt, but write separately to express my personal belief that Ohio's motto trivializes the very faith it purports to strengthen.

The Supreme Court has consistently described the Establishment Clause as forbidding not only state action motivated by the desire to advance religion, but also that intended to "disapprove," "inhibit," or evince "hostility" toward religion. *See Edwards v. Aguillard*, 482 U.S. 578, 616 (1987) (Scalia, J., dissenting). I believe that successive attempts at public piety make true religion ring more and more hollow. By adding to the spate of state-sponsored religious imagery, I believe that this motto makes Jesus' words a mere symbolic commodity, and inhibits religion as much as advances it.

Justice Kennedy noted in 1992 that the First Amendment's Religion Clauses ensure religion's freedom from government interference as much as they command the state not to bolster a particular faith. "The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission. It must not be forgotten then, that while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, these same Clauses exist to protect religion from government interference." *Lee v. Weisman*, 505 U.S. 577, 589 (1992). James Madison knew this, too. He did not think the Establishment Clause should be included among the Bill of Rights purely as a protective measure for the minority. Rather, "experience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." *Id.*

Testaments: "[I]n God I have put my trust" (Psalm 56:4, 11); "Behold, God is my salvation; I will trust" (Isaiah 12:2); "We trust in the LORD our God" (Isaiah 36:7); "[W]e should not trust in ourselves, but in God which raiseth the dead" (2 Corinthians 1:9); "[W]e trust in the living God" (1 Timothy 4:10); "[N]or trust in uncertain riches, but in the living God" (1 Timothy 6:17); and "I will put my trust in him" (Hebrews 2:13). Moreover, the history of the national motto as described by the Department of the Treasury on its website, Fact Sheet OPC-11, indicates that the national motto was placed on United States coins "largely because of the increased religious sentiment existing during the Civil War." According to the Department of Treasury, then Secretary of Treasury Chase "received many appeals from devout persons" urging the Secretary to recognize God on United States coins. The first of such letters, written in 1861, assumed that the Secretary was a "Christian" and stated that such a reference to God "would relieve us from the ignominy of heathenism." Seven days later, the Secretary ordered that the "trust of our people in God [be] declared on our national coins," stating, "[n]o nation can be strong except in the strength of God, or safe except in His defense." If the dissent's argument is that the two mottos are constitutionally distinguishable because the Ohio state motto is a more direct quote from the Bible than the national motto, I believe that such a distinction ignores Supreme Court admonitions against *per se* rules and hypertechnicality. *See Lynch v. Donnelly*, 465 U.S. 668, 678 (1984) ("Rather than mechanically invalidating governmental conduct . . . that benefit or give special recognition in general to one faith--as an absolutist approach would dictate--the Court has scrutinized challenged . . . official conduct to determine, whether, *in reality*, it establishes a religion or religious faith, or tends to do so.") (emphasis added). Contrary to the dissent's argument, both mottos have their origin in religion and can be traced to the Bible.

Accordingly, I concur in the judgment reached by the majority opinion.

entirely free from the fostering care and protection of religion, as connected with the personal, social and domestic virtues of its people . . . ." *Gabel v. City of Houston*, 29 Tex. 335, 345 (Tex. 1867).

As these and other cases demonstrate, the prohibition against enactment of laws establishing religion or paving the way for an establishment of religion was not understood to be a prohibition against fostering or protecting religion (governments routinely fostered and protected religion by exempting church property from taxation, for example, see *Walz v. Tax Comm'n*, 397 U.S. 664 (1970)), nor was it understood to be a prohibition against employing generalized religious language in official discourse. The notion that the First Amendment was designed to impose a secular political culture on the nation would have struck most 19th Century judges as absurd.

As a unanimous Supreme Court declared in *Church of the Holy Trinity v. United States*, 143 U.S. 457, 465 (1892) (a decision, by the way, that foreshadows the sort of "judicial activism" for which many 20th Century judges have been criticized in some quarters),

"no purpose of action against religion can be imputed to any legislation, state or national, because this is a religious people. This is historically true. From the discovery of this continent to the present hour [*i.e.*, the morning of February 29, 1892 – a point in time long after the ratification of the Fourteenth Amendment], there is not a single voice making this affirmation."

After marshalling a truly impressive body of historical evidence in support of its thesis, the *Church of the Holy Trinity* Court summed up as follows:

"There is no dissonance in these declarations. There is a universal language pervading them all, having one meaning; they affirm and reaffirm that *this is a religious nation.*" *Id.* at 470. (Emphasis supplied.)

Nineteenth Century commentary echoed what the courts themselves said about the nature of the evils from which the Establishment Clause was designed to protect us. In his celebrated constitutional treatise, for example, Mr. Justice Story explained that the Establishment Clause was meant "to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1871, at 728 (1833). An 1853 Senate Judiciary Report on congressional chaplains made much the same point:

"If Congress has passed, or should pass, any law which, fairly construed, has in any degree introduced, or should attempt to introduce, in favor of any church, or ecclesiastical association, or system of religious faith all or any one of these obnoxious particulars – endowment at the public expense, peculiar privileges to its members, or disadvantages or penalties upon those who should reject its doctrines or belong to other communions – such law would be a 'law respecting an establishment of religion,' and therefore in violation of the constitution." S. Rep. No. 376, 32d Cong., 2d Sess. 2 (1853) (quoted in Kurt T. Lash, *The Second Adoption of the Establishment Clause: The Rise of the Nonestablishment Principle*, 27 Ariz. St. L.J. 1085, 1135 (1995)).

As one might suppose, the 19th Century offers countless instances in which political leaders, acting in their official capacities, thanked God for the blessings bestowed on the Republic and prayed that the nation might continue to enjoy His favor. See generally Catherine L. Albanese, *Sons of the Fathers: The Civil Religion of the American Revolution* 183-99 (1976); Richard J. Carwardine, *Evangelicals and Politics in Antebellum America* 19-22, 40-42 (1993); John Witte, Jr., *Religion and the American Constitutional Experiment* 96-98 (2000). Most presidents have followed the example of President Washington in proclaiming a public day of thanksgiving to God. See *Lynch v. Donnelly*, 465 U.S. 668,

disapprove the national motto, has clearly signaled, at least by implication, that the national motto is not at odds with constitutional principles.

Although I find portions of the dissent to be persuasive, I find wholly unconvincing the dissent's asserted distinction between the national motto and the Ohio motto. Either or both mottos, in my estimation, may reasonably be understood to refer to "God" as an omnipotent one who intervenes in human affairs, on the one hand, or as one who does not intervene in human affairs but is looked to for spiritual comfort, on the other hand; indeed, they both may reasonably be regarded as signifying both purposes. Contrary to the dissent's argument, I would surmise that many people may derive comfort from the motto "In God We Trust" only because they believe that the motto refers to an omnipotent and omniscient as well as benevolent God. In other words, He is a God in whom they trust because He possesses the powers and qualities of omnipotence and omniscience. Conversely, and by the same token, I think I can also reasonably surmise that the Ohio motto "With God All Things Are Possible" may be regarded by some as prayerful or exhortatory, thereby providing spiritual comfort, in addition to, or apart from, invoking an omnipotent and omniscient God who intervenes in human affairs. And although I might reach an altogether different result in my reading of First Amendment jurisprudence if I were deciding this case on a clean slate and without reference to the de facto legalization of the national motto of "In God We Trust," I simply do not discern a meaningful ecclesiastically qualitative distinction between the import of the two phrases, "In God We Trust," and "With God All Things Are Possible," for Establishment Clause purposes.

The dissent seems to argue that the Ohio motto differs from the national motto because it comes directly from Matthew 19:26, a book in the New Testament of the Bible. This point of departure, however, is unpersuasive since the national motto can also be traced to the Bible, both the Old and New

---

## CONCURRENCE

---

CLAY, Circuit Judge, concurring.   I find much to recommend in the reasoning of both the majority opinion and the dissenting opinion even though the two opinions purport, in many ways, to be unalterably opposed to one another.  Both opinions contain arguments of persuasive value, and when read in juxtaposition to one another, serve to highlight the issue being addressed as a complex and difficult one rooted in the nation's social and political history, its religious traditions, and its First Amendment jurisprudence.  Both opinions, when read together, well illustrate the courts' inability to develop a consensus with respect to the extensive intellectual debate concerning the requirements of the First Amendment in a factual context such as the one presented by this case.

I concur in the majority opinion, not because I necessarily embrace all of its reasoning, but because the Supreme Court has, by implication, approved for public enshrinement the national motto of "In God We Trust" by denying *certiorari* with respect to two of the three cases of our sister circuits challenging the motto where *certiorari* was sought and where the constitutionality of the national motto was upheld against challenges based on the Establishment Clause.  *See Gaylor v. United States*, 74 F.3d 214 (10th Cir.), *cert. denied*, 517 U.S. 1211 (1996); *O'Hair v. Murray*, 588 F.2d 1144 (5th Cir.), *cert. denied*, 442 U.S. 930 (1979); *Aronow v. United States*, 432 F.2d 242 (9th Cir. 1970).  Because I do not find the import of the Ohio motto at issue in this case, when considered in context and with reference to both its literal and symbolic meanings, to be significantly distinguishable from the national motto, I do not believe this Court could logically disapprove of the Ohio motto on establishment of religion grounds so long as the national motto passes constitutional muster.  And again, the Supreme Court, by failing to

675 n.2 (1984).  And in his magisterial Gettysburg Address, President Lincoln urged those who heard his words to resolve "that this nation, *under God*, shall have a new birth of freedom."  Abraham Lincoln, *Address at Gettysburg* (Nov. 16, 1863) (emphasis supplied), in 7 *The Works of Abraham Lincoln* 20 (1906).

Although Lincoln (unlike Washington and Jefferson) may never have been a churchman, from the time he was elected president until the time of his death Lincoln repeatedly acknowledged this nation's need for divine assistance.  The following example, from remarks Lincoln delivered at Buffalo, New York, shortly before his first inaugural, is particularly instructive:

> "Your worthy mayor has thought fit to express the hope that I may be able to relieve the country from the present, or, I should say, the threatened difficulties. . . .  For the ability to perform it, I must trust in that Supreme Being who has never forsaken this favored land, through the instrumentality of this great and intelligent people.  Without that assistance I shall surely fail; *with it, I cannot fail*."  Abraham Lincoln, Address delivered February 16, 1861 (emphasis supplied), in 5 *The Works of Abraham Lincoln* 222 (1906).

On the eve of our national cataclysm, in other words, Abraham Lincoln was saying something very close to what Ohio now says in its motto:  With God, all things are possible.

B

Given the history referred to above, it seems reasonably clear to us that in the age of Washington, Jefferson and Madison, as in the age of Lincoln, the statute in which Ohio established its current motto would not have been deemed violative of the United States Constitution as a law respecting an establishment of religion.  And, all things considered, we think the plaintiffs were probably wise to abandon any attempt to show that there was ever a time when the motto

would have been deemed to violate Article 1 § 7 of the Ohio Constitution.

The motto involves no coercion. It does not purport to compel belief or acquiescence. It does not command participation in any form of religious exercise. It does not assert a preference for one religious denomination or sect over others, and it does not involve the state in the governance of any church. It imposes no tax or other impost for the support of any church or group of churches. Neither does it impose any religious test as a qualification for holding political office, voting in elections, teaching at a university, or exercising any other right or privilege. And, as far as we can see, its adoption by the General Assembly does not represent a step calculated to lead to any of these prohibited ends.

The motto is merely a broadly worded expression of a religious/philosophical sentiment that happens to be widely shared by the citizens of Ohio. As such, we believe, the motto fits comfortably within this country's long and deeply entrenched tradition of civic piety, or "ceremonial deism," as Yale Law School's Eugene Rostow called it. Like state-financed prayers by a legislative chaplain, "it is simply a tolerable acknowledgment of beliefs widely held among the people of this country." See *Marsh v. Chambers*, 463 U.S. 783, 792 (1983). Judged by historical standards, adoption of the motto no more represents a step toward an establishment of religion than does our own practice of opening each session of court with a crier's recitation of the set piece that concludes – in words also called out in the United States Supreme Court each day that Court sits – "God save the United States and this Honorable Court."

If our history demonstrates anything, it demonstrates that "[t]he people of the United States did not adopt the Bill of Rights in order to strip the public square of every last shred of public piety." *Chaudhuri v. State of Tenn.*, 130 F.3d 232, 236 (6th Cir. 1997), *cert. denied*, 523 U.S. 1024 (1998). The notion that the First Amendment commands "a brooding and

honorable court. The slippery slope argument, it seems to us, gives insufficient weight to the fact that just as lawyers can cite precedents, judges can draw distinctions. (Anyone who may doubt the capacity of intelligent judges to draw exquisitely fine distinctions will find such doubts completely assuaged, we suspect, after a close reading of the dissent in this case.)

We readily acknowledge, finally, that some Americans would probably like the courts to sanction an establishment of religion in this country, notwithstanding the Constitution's express proscription of any such establishment. Other Americans would probably like the courts to extirpate every vestige of our religious heritage from the public square, notwithstanding the Constitution's conspicuous lack of any command that this be done. But most Americans, we trust, would not want the courts to let themselves be seduced into either error. Most Americans, in other words, would prefer that the courts enforce the Constitution according to its terms. They would agree with Judge Learned Hand, who in his Oliver Wendell Holmes lectures at the Harvard Law School warned the judiciary not to "assume the role of a third legislative chamber." L. Hand, *The Bill of Rights* at 55 (Harv. Univ. Press, 1958). The only basis on which the judiciary's assumption of such a role can rest, as Hand vividly (if somewhat eponymously) put it, is "a *coup de main.*" *Id.*

before us is a narrow one.  The United States Constitution requires us to decide one question and one question only: whether Ohio Rev. Code § 5.06 is a "law respecting an establishment of religion."  If we answer that question in the negative, our job is over.  We might wish that the Framers of the Constitution had chosen to give us the powers of a council of revision, but they did not do so.

Obviously, however, the plaintiffs are not without a remedy.  As helpfully explained in the latest edition of the Ohio Citizen's Digest, "Ohio's state government contains three branches:  executive, legislative and judicial."  The plaintiffs' remedy lies not with the judicial branch, but with the branch that repealed the first Ohio motto by which some of the state's citizenry were irritated.

For all of the foregoing reasons, and for the reasons articulated by the District Judge Graham in his carefully drawn opinion, the challenged judgment is **AFFIRMED**.[22]

---

[22]The principal dissenting opinion sees our affirmance of Judge Graham's decision as evidence that "our Court has been seduced into establishment [of religion] by increments."  And tomorrow, it is hinted, the affirmance will be cited in defense of the constitutionality of some other expression of "civic piety" that is claimed to be lubricating a slippery slope tilted toward theocracy.

We, of course, believe that our court is affirming a decision that simply follows the Constitution – and, in doing so, we believe, the court is adhering to what James Madison, in a passage quoted by the dissent, called "a right principle."  But we certainly have no quarrel with the dissent's suggestion that the affirmance will be cited in defense of other expressions of civic piety that are claimed to violate the Establishment Clause.

We Americans are not only a religious people, after all, we are a litigious people.  Litigious people – especially those represented by counsel – do cite precedents.  And if this court were to reverse Judge Graham's decision, we have absolutely no doubt that the reversal would be used to attack other expressions of civic piety –  the pledge of allegiance, for example, or the national anthem, or the public expression of hope that a God with the power to grant salvation will "save" this

pervasive devotion to the secular," to borrow the late Justice Arthur Goldberg's dismissive phrase, is a notion that simply perverts our history.  See *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring).

The large body of historical evidence concerning the original understanding of the constitutional provisions at issue here may or may not be dispositive of the present appeal. The importance of that evidence, however, can hardly be doubted.  See *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888) (quoted with approval in *Marsh*, 463 U.S. 790), where the Supreme Court declared that an act "passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument . . . is contemporaneous and weighty evidence of its *true meaning*." (Emphasis supplied.)

In *Marsh* itself –  where the Supreme Court applied what it held to be the "true meaning" of the Establishment Clause – the Court sustained the constitutionality of a practice under which the State of Nebraska paid the salary of a clergyman employed to serve as chaplain to the state legislature.  It was the chaplain's job to offer a public prayer at the opening of each legislative day.[8]  The Supreme Court pointed out that "the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as violative of that Amendment . . . ." *Marsh*, 463 U.S. at 788. This fact, reinforced by the fact that the practice had been followed at both federal and state levels ever since, established more than an historical pattern, in the Court's view; the historical evidence, said the Court, "sheds light not

---

[8]These prayers were collected and published in book form, at taxpayer expense, and copies were distributed to both members and nonmembers of the legislature.  See *Chambers v. Marsh*, 675 F.2d 228, 235 (8th Cir. 1982), where the court of appeals, in a decision that was soon to be reversed by the Supreme Court, held the Nebraska practice unconstitutional.

only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that clause applied to the practice authorized by the First Congress – their actions reveal their intent." *Id*. at 790.

If *Marsh* remains good law today (and the Court has given us no solid reason to doubt that it does), the Supreme Court's decision in that case obviously supports the conclusion reached by the district court in the case at bar. The actions of the First Congress, as we have seen, reveal that its members were not in the least disposed to prevent the national government from acknowledging the existence of Him they were pleased to call "Almighty God," or from thanking God for His blessings on this country, or from declaring religion, among other things, "necessary to good government and the happiness of mankind."

The drafters of the First Amendment could not reasonably be thought to have intended to prohibit the government from adopting a motto such as Ohio's just because the motto has "God" at its center. If the test which the Supreme Court applied in *Marsh* is to be taken as our guide, then, Ohio's God-centered motto clearly passes constitutional muster.

The national government itself adopted just such a motto in the Act of July 30, 1956 (70 Stat. 732)), now codified as 36 U.S.C. § 302: "'In God we trust' is the national motto."[9] No

---

[9] An interesting precursor of the 1956 statute, as the district court pointed out, is the Act of March 3, 1931 (46 Stat. 1508), codified at 36 U.S.C. § 301. The 1931 Act officially designates as the national anthem "[t]he composition consisting of the words and music known as the Star-Spangled Banner."

The words thus sanctified by Congress as part of the national anthem include this memorable couplet:

"Then conquer we must, when our cause it is just,
*And this be our motto:   'In God is our trust.'*"
(Emphasis supplied.)   (Quoted in *A.C.L.U.* at 120 F.

---

probably be exacerbated by familiarity with the informal legislative history of the relevant statute.[21]

But the question before us is not whether a reasonable person could be irritated by any or all of this. Much of what government does is irritating to someone. For example, the substantive content of the forms distributed by the Ohio Department of Taxation – particularly the line on the income tax form that says "**AMOUNT YOU OWE**" – is likely to be more irritating to more Ohioans than any motto imprinted on the Tax Department's stationery. This hardly makes the income tax unconstitutional. Our level of irritation with a given governmental action is simply not a reliable gauge of the action's constitutionality. The mere fact that something done by the government may offend us philosophically or aesthetically does not mean, *ipso facto*, that the Constitution is offended.

Under the form of government that has served us well for over two centuries, the role of this court in the case now

---

[21] Ted W. Brown is no longer available to defend himself, and there is obviously much to be said for the precept *de mortuis nil nisi bonum.* Still, we hope we may be forgiven for acknowledging the probability that there is more than a grain of truth in the district court's hint that Secretary Brown was acting from mixed motives, at least, in exploiting the religiosity of a schoolboy to help get the motto adopted by the General Assembly, generating favorable publicity for Ted W. Brown in the process.

As Bismarck suggested, the making of laws, like the making of sausage, is something from which the fastidious person would often be well advised to avert his or her gaze. There appears to have been nothing remarkable about the motivations of the people responsible for passage of the Ohio motto statute, and in the fashioning of most of our laws, we imagine, sensitive nostrils could detect a whiff of self-interest somewhere. A measure of self-interest on the part of the promoters of legislative action (or on the part of the opponents of legislative action, for that matter) is an entirely normal component of the democratic process. And this elementary fact certainly does not taint the legitimacy of the Ohio Revised Code.

### III

We conclude with a few words about some of the objections that the plaintiffs and others have advanced against the motto on religious, philosophical, or aesthetic grounds.

One of the Rev. Mr. Peterson's main objections to the motto is its tendency to trivialize something that is precious to him and to other devout Christians who share his sensibilities. He obviously has a point.

Associating the words of Jesus Christ with a lot of ponderous verbiage about canned tomato juice ("[t]he canned, processed juice and pulp of the fruit of the herb Lycopersicon esculentum") and Huffman dam's fossilized trilobites ("Isotelus, a genus of extinct marine anthropod of the class trilobita") is something that could well irritate any citizen who, like Mr. Peterson, takes the words of Jesus seriously.[20] And we can readily appreciate the fact that Mr. Peterson's irritation with the motto could be shared – albeit for very different reasons – by citizens having religious and philosophical outlooks totally different than this Presbyterian pastor's. If one has come to the conclusion that there is no God, for example, or if one concludes that it is impossible to know whether God exists, or if one believes that God may exist but that His attributes are unknowable to man, it is readily understandable that one might find it very irritating indeed for the State of Ohio to support not only the proposition that God exists, but the proposition that with Him "all things are possible." And any such irritation would

---

[20]By the same token, we suppose, the promiscuous use that the federal government makes of the national motto – even displaying it on our coinage and currency, of all things – could well irritate any citizen who reveres the Old Testament. See Psalms 56:11 ("In God have I put my trust: I will not be afraid what man can do unto me").

fewer than three of our sister circuits have upheld the constitutionality of the national motto against challenges based on the Establishment Clause. See *Aronow v. United States*, 432 F.2d 242 (9th Cir. 1970); *O'Hair v. Murray*, 588 F.2d 1144 (5th Cir.), *cert. denied*, 442 U.S. 930 (1979); *Gaylor v. United States*, 74 F.3d 214 (10th Cir.), *cert. denied*, 517 U.S. 1211 (1996). The Supreme Court has never questioned the proposition that the national motto can survive scrutiny under the Establishment Clause, and we should be utterly amazed if the Court were to question the motto's constitutionality now.[10] The national motto happens to be

---

Supp. 2d 1181.)

Also interesting is the statute's prescription of what the catch-line to 36 U.S.C. § 301(b) refers to as **"Conduct during playing."** If the flag is displayed during a rendition of the national anthem, § 301(b)(1) instructs,

> "(A) all present except those in uniform should stand at attention facing the flag with the right hand over the heart;
>
> (B) men not in uniform should remove their headdress with their right hand and hold the headdress at the left shoulder, the hand being over the heart."

(When the flag is not displayed, § 301(b)(2) goes on to say, "[a]ll present should face toward the music and act in the same manner they would if the flag were displayed.")

Ohio, of course, has never proposed that men walking past the motto on Capitol Square or elsewhere should remove their hats and hold them over their hearts. If 36 U.S.C. § 301 is any indication, however, the Ohio motto would not be unconstitutional even if the General Assembly had recommended such conduct.

[10]We should also be amazed if the Supreme Court were now to question the constitutionality of the Act of June 14, 1954 (68 Stat. 249), codified at 36 U.S.C. § 172. That is the statute, enacted two years before enactment of Ohio's motto statute, in which Congress, taking a leaf from the Gettysburg Address, amended the Pledge of Allegiance by inserting

inscribed directly above and behind the Speaker's Chair in the United States House of Representatives Chamber, and the idea of any federal court having the temerity to order the inscription stricken from the nation's Capitol strikes us as ludicrous.

C

It has been argued that there is a world of constitutional difference between "In God We Trust" and "With God All Things Are Possible."[11]  In the real world, it seems to us, the alleged difference is almost impossible to discern.  To the reasonable observer – a person relatively unschooled in the more esoteric reaches of theology, philosophy, and biblical exegesis – both mottos would appear to  have been cut from the same bolt of cloth.[12] The purported distinction strikes us as utterly unpersuasive.

---

the phrase "under God" between "one Nation" and "indivisible."

[11] The principal dissenting opinion accepts this argument.  The God of the national motto is not identified as "a personal, all-powerful, all-knowing God who 'makes all things possible' by intervening in daily affairs," the dissent suggests, from which it presumably follows that public recognition of the trust we place in the national motto's God does not constitute an establishment of religion.  But the Ohio motto, according to the dissent, "conveys a sectarian view of God as interventionist, active, and omnipotent" – and official recognition of the power of the Ohio motto's God, it is suggested, does constitute an establishment of religion.

Judge Clay's concurring opinion counters with the proposition that each motto could reasonably be understood to refer to either type of God.  This proposition is clearly correct, it seems to us.

[12] The alleged distinction might be deemed even more absurd in the world of philosophy than in the world most of us inhabit.  Professor Thomas P. Kasulis, who holds bachelor's, master's and doctoral degrees in philosophy from Yale University, plus a master's level degree in Asian philosophy from the University of Hawaii, and is currently Chair of the Division of Comparative Studies at The Ohio State University in Columbus, Ohio, explains in an affidavit admitted as part of the record in

2

Under the second branch of the *Lemon* test we must ask whether the "primary effect" of the Ohio motto is one that either advances or inhibits religion.  The plaintiffs do not appear to argue that the motto inhibits religion, so we confine ourselves to the question whether the motto's primary effect is one of advancement of religion.

The district court found that "the Ohio motto does not have the primary or principal purpose of advancing religion . . . ." *A.C.L.U.*, 20 F. Supp. 2d at 1182.  We agree – and we would add that just as the motto does not have as its primary "purpose" the advancement of religion, it does not have the primary *effect* of advancing religion either.

If a state does not "advance" religion in an unconstitutional manner when it exempts church property from taxation  – and we presume that *Waltz v. Tax Comm'n*, 397 U.S. 664 (1970), is still good law  –  we do not believe that a state advances religion impermissibly by adopting a motto that provides no financial relief to any church but pays lip service to the puissance of God.  The primary effect of the national motto is not to advance religion, we take it, and we think it clearly follows that the primary effect of the state motto is not to advance religion either.

3

Under the third branch of the *Lemon* test, finally, we ask whether Ohio's motto fosters an excessive government entanglement with religion.  "The entanglement prong of the *Lemon* test," as Justice O'Connor has stated, "is properly limited to institutional entanglement." *Lynch*, 465 U.S. at 689 (O'Connor, J., concurring).  No such entanglement is evident here.  Validating its own message, perhaps, the Ohio motto thus survives scrutiny under all three parts of the *Lemon* test.

motto,[19] Ohio seems to be conveying much the same message: "Higher." This is not the only aspect of the message Ohio seeks to convey, of course, but it is an important aspect of that message.

Like the national motto, and the national anthem, and the pledge of allegiance, the Ohio motto is a symbol of a common identity. Such symbols unquestionably serve an important secular purpose – reenforcing the citizen's sense of membership in an identifiable state or nation – and the fact that this and the other purposes mentioned are not exclusively secular hardly means that the motto fails the test. "Were the test that the government must have 'exclusively secular' objectives," as the Supreme Court noted in *Lynch v. Donnelly*, U.S. 465 at 681 n.6, "much of the conduct and legislation this Court has approved in the past would have been invalidated."

The particular conduct at issue in *Lynch* was engaged in by the City of Pawtucket, Rhode Island. That city had incorporated a crèche in a display erected in the heart of the shopping district as part of the city's observance of the Christmas holiday season. Traditionalists may recall that there was a time, at least, when a crèche – which typically includes figures representing the Infant Jesus, Mary and Joseph, angels, shepherds, kings and animals – was associated rather closely in the public mind with the Christian religion. The Supreme Court nonetheless held in *Lynch* that it was "clearly erroneous" for the trial court to find, as that court had found, that Pawtucket's display of the crèche had "no secular purpose." *Id.* at 681.

In the case at bar, the district court found that Ohio's current and projected use of the motto does in fact have "a valid secular purpose." *A.C.L.U.,* 20 F. Supp. 2d at 1182. In light of *Lynch*, we should be hard pressed to call this finding erroneous.

---

[19]"Excelsior." New York State Law § 70 (McKinney's 2000).

Our "reasonable observer" is a judicial construct, of course – much like the "reasonable person" in the law of torts – but this fictive being often plays an important role in contemporary First Amendment jurisprudence. This is so because, under our current understanding of the Establishment Clause, we should almost certainly be required to hold the Ohio motto unconstitutional were we to conclude that a reasonable observer would take the motto to be an official endorsement of the Christian religion. See *Pinette*, 515 U.S. at 778-80 (O'Connor, J., concurring). "The relevant issue," as Justice O'Connor has said elsewhere, is "whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement . . . ." *Wallace v. Jaffree*, 472 U.S. 38, 76 (1985) (O'Connor, J., concurring).

Although the reasonable observer is "deemed aware of the history and context of the community and forum in which the religious display appears" *Pinette*, 515 U.S. at 780 (O'Connor, J., concurring), such an observer is not to be deemed omniscient. While "[t]here is always *someone* who, with a particular quantum of knowledge, reasonably might perceive a particular action as an endorsement of religion," that "someone" does not personify the community ideal with which we are concerned in applying the endorsement test. *Id*. (O'Connor, J., concurring).

---

this case that

> "the state motto does not intrinsically exhort a particular sentiment or attitude toward God. It is not creedal in form, that is, it does not assert or advocate a particular attitude that citizens take toward God. In this regard, the state motto is even less psychologically or spiritually normative than the U.S. motto, "In God we trust," for example. Unlike the U.S. motto, the Ohio motto does not explicitly affirm or advocate anything about our attitude or orientation toward God."

Professor Kasulis' testimony on this point stands unrefuted in the record.

The truth of the matter, of course, is that no reasonable observer of the Ohio scene is likely to have an encyclopedic knowledge of press releases issued more than 40 years ago by the late Secretary of State Ted W. Brown. (See the text accompanying note 2, *supra*.) And – depressing though it may be to anyone inclined to agree with the framers of the Northwest Ordinance that schools and the means of education should forever be encouraged for the reason that "[r]eligion, morality, and knowledge [are] necessary to good government and the happiness of mankind" – it is also true that most Ohio citizens credited with being aware of "the history and context" of their community are unlikely to have even the vaguest notion of the source from which Ohio's motto was drawn. At the trial of this case, for example, one of the plaintiffs' own expert witnesses – a Jewish rabbi (who, it should be said in fairness, did not present himself as an expert on the gospels) – admitted that he could not have identified the source of the motto before his recollection was refreshed by the A.C.L.U. If placed under oath, similarly, few members of this court could deny having been in the same boat as the rabbi.[13]  If our "reasonable observer" is to bear any reasonable resemblance to ordinary people, ignorance alone would doubtless provide a sufficient guaranty that such an observer would not see Ohio's motto as an endorsement of Christianity.

It is probably not the case, however, that the idealized observer ought to be deemed as ill-informed as he or she almost certainly would be in real life. See *Pinette*, 515 U.S.

---

[13] A poll conducted in the Spring of 1997, using questions framed by the A.C.L.U. itself, confirms that we have plenty of company. Shortly before the filing of the lawsuit, the poll discloses, only about two percent of randomly selected citizens of Summit County, Ohio, could come reasonably close to recalling the *content* of Ohio's motto, to say nothing of its *source*. We presume that this percentage has now risen, thanks to the A.C.L.U.'s well-publicized litigation efforts, but we also presume that the effect of the good work the organization has done in educating Ohio's citizenry is likely to prove transitory. The record, in any event, contains no poll results subsequent to the cited Summit County poll.

MacDonald, with special lyrics by Wilbert B. McBride, and the music being composed by Mary Earl"[18]).

If the wisdom embodied in the canon of construction commonly known as "*noscitur a sociis*" has anything to teach us here, it is that the company in which Ohio Rev. Code § 5.06 finds itself tends to undermine the thesis that § 5.06 somehow represents a first step in the direction of "an establishment of religion." Anyone who reads Chapter 5 with an open mind, we believe, will agree that this is a very peculiar way to gear up for something as serious as an establishment of religion.

At a deeper level, the State of Ohio has claimed this secular purpose for the motto: "It inculcates hope, makes Ohio unique, solemnizes occasions, and acknowledges the humility that government leaders frequently feel in grappling with difficult public policy issues." Defendants' Memorandum Contra Plaintiffs' Motion For Preliminary Injunction, p. 21, as quoted in *A.C.L.U.*, 20 F. Supp. 2d at 1182.

"Unless it seems to be a sham, . . . the government's assertion of a legitimate secular purpose is entitled to deference." *Brooks v. City of Oak Ridge*, 222 F.3d 259, 265 (6th Cir. 2000) (quoting *Chaudhuri*, 130 F.3d at 236). The record of the instant case supports the conclusion that Ohio's statement of a secular purpose is not a sham; like Yogi Berra's aphorism about its not being over until it's over, as the record indicates, the Ohio motto legitimately serves a secular purpose in boosting morale, instilling confidence and optimism, and exhorting the listener or reader not to give up and to continue to strive. In a tongue less pretentious, perhaps, than that employed by the State of New York in its

---

[18] Should there be a stray reader who remains awake at this point, we shall spare him or her the "special lyrics" set forth in the statute.

official reptile of the state"); § 5.032 ("The animal, *Odocoileus virginianus*, commonly known as the white-tailed deer, is the official animal of the state. Naming the white-tailed deer as the official animal of the state does not relieve the division of wildlife of its duty to manage the deer population and its distribution"[17]); § 5.04 ("The coat of arms of the state shall consist of the following device: a circular shield; in the right foreground of the shield a full sheaf of wheat bound and standing erect; in the left foreground, a cluster of seventeen arrows bound in the center and resembling in form the sheaf of wheat; in the background, a representation of Mount Logan, Ross county, as viewed from Adena state memorial; over the mount, a rising sun three-quarters exposed and radiating seventeen rays, the exterior extremities of which rays form a semicircle; and uniting the background and foreground, a representation of the Scioto river and cultivated fields"); § 5.05 ("The tree, *Aesculus globra** [*glabra], commonly known as the 'Buckeye' is hereby adopted as the official tree of the state"); § 5.07 ("The gem stone 'Ohio Flint," a crypto-crystalline variety of quartz, is hereby adopted as the official gem stone of the state"); § 5.071 ("*Isotelus*, a genus of extinct marine anthropod of the class *trilobita*, that lived in the seas that covered Ohio during the ordovician period, about four hundred forty million years ago, and represented by the largest known complete trilobite, collected at Huffman dam in Montgomery county, is hereby adopted as the official invertebrate fossil of the state"); § 5.08 ("The canned, processed juice and pulp of the fruit of the herb *Lycopersicon esculentum*, commonly known as tomato juice, is hereby adopted as the official beverage of the state"); and § 5.09 ("The song, 'Beautiful Ohio,' is hereby adopted as the official song of the state, the lyric being written by Ballard

---

[17]Was it Wilde who said that all men kill the thing they love?

at 780, where Justice O'Connor, in her concurring opinion, said that "proper application of the endorsement test requires that the reasonable observer be deemed more informed than the casual passerby . . . ." As a matter of law, in other words, it may well be that the reasonable observer ought to be deemed to know about Secretary Brown's press releases and other official literature identifying the source of the motto,[14] as well as being credited with detailed knowledge of the text of the New Testament, plus some familiarity with the religious and philosophical traditions of the various peoples, ancient and modern, who have contributed to the religious, cultural and philosophical heritage of the State of Ohio.

Based on the record before us, we consider it most unlikely that an observer as well informed as this could discern an endorsement of Christianity in the words of Ohio's motto. There is, after all, nothing uniquely Christian about the

---

[14]One of the trial exhibits that falls in the "other official literature" category is a pamphlet issued by Secretary Brown under the title "Ohio's Capitals [there have been three: Chillicothe, Zanesville, and Columbus] and the Story of Ohio's Emblems." One page of the pamphlet depicts eleven numbered "Symbols of the State of Ohio," namely the state animal, the state insect, the state bird, the state fossil, the state flag, the state seal, the state motto, the state flower, the state tree, the state beverage, and the state gemstone. The next page provides snippets of information on each of these symbols plus "The State Song" and "The State Rock Song." The write-up on the motto (the seventh symbol listed) informs the reader – in rather small print – that "[i]n 1959 the Ohio legislature adopted the state's motto, 'With God all things are possible' (Matthew 19:26)."

As secretary of state, current Ohio Governor Bob Taft issued a revised version of the pamphlet under the title "Ohio Citizen's Digest." The Taft edition pictures twelve "Ohio Symbols" – the General Assembly having added a state reptile to the menagerie by this time  –  and this edition contains an expanded write-up on symbol number seven:

> "In 1959, the Ohio legislature adopted the state's motto, 'With God all things are possible' (Matthew 19:26). An earlier motto 'Imperium in Imperio' (An Empire within an Empire) was adopted in 1865 but repealed two years later because Ohioans thought it too pretentious."

thought that all things are possible with God.  As Dr. David J. Belcastro, an expert in biblical hermeneutics, explains in an affidavit prepared for this case,

"2.  The phrase 'With God all things are possible.' is as much at home in the  Greek philosophical tradition as within the Judeo-Christian tradition.  Homer (probably 8th century B.C.) wrote, 'To the gods all things are possible.'  Sophocles (c. 496 - 406 B.C.) wrote, 'When a god works, all is possible.'  Plutarch (c. 50 - c. 120 A.D.) quoted Callimachus (c. 305 - c. 240 B.C.) as saying, 'There is nothing that God cannot effect.'
"3.    Similar phrases can be found in Hebrew Scriptures/Old Testament.

\* \* \*

The . . . reference in the Gospel texts to a camel passing through an eye of a needle is a proverbial saying.  The fact that it stands in parallel to the phrase in question, suggests that the phrase 'With God all things are possible.' is also a proverb commonly known in Jesus' day.

"4.  The meaning of the phrase 'With God all things are possible.' is not about salvation but discipleship.

\* \* \*

The question raised by the rich ruler, 'What must I do to be saved?' has been turned on its head by Jesus' indirect answer, which is, following the thrust of the text, 'Give up trying to be saved along with your desire for wealth and power.'"

Dr. Belcastro then concludes his affidavit with these observations:

"5.  The phrase in question may not be a dominical saying.  That is to say, Jesus may never have actually said

Happily, we think, the facts of the case at bar are such that the choice of a test is unlikely to affect the outcome of the appeal.  For reasons to which we turn next, it seems to us that Ohio's motto easily passes the *Lemon* test, just as it passes the endorsement test and the *Marsh* test.

### D

Like all Gaul, the *Lemon* test is divided into three parts:[16]

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612-13 (citations and quotation marks omitted).

### 1

Taking each part of the test in order, we ask first whether the statute adopting the Ohio motto (Ohio Rev. Code § 5.06) has a secular legislative purpose.  We are satisfied that it does.

At the most superficial level, § 5.06 would appear to have a general purpose roughly comparable to the purposes of the sections that surround it in Chapter 5 of the Ohio Revised Code.  See Ohio Rev. Code § 5.02 ("The scarlet carnation is hereby adopted as the state flower as a token of love and reverence for the memory of William McKinley"); § 5.021 ("The plant trillium grandiflorum, commonly known as the large white trillium, found in every Ohio county, is hereby adopted as the state wildflower"); § 5.03 ("The bird, cardinalis cardinalis, commonly known as the 'cardinal,' is the official bird of the state"); § 5.031 ("The snake, Coluber constrictor constrictor, known as the black racer, is the

---

[16]Or "quartered into three halves," to use the wording of the little witticism with which 19th Century schoolchildren sometimes lightened the labor of translating Caesar.

perhaps, that even the author of the *Lemon* decision, the late Chief Justice Burger, did not see fit to apply the *Lemon* test when he wrote the Court's opinion in the legislative chaplain case, *Marsh v. Chambers*, 463 U.S. 783 (1983). *Marsh*'s only reference to the *Lemon* test occurs in a discussion of the proceedings below, where it is noted that the Court of Appeals for the Eighth Circuit – the court whose decision the Supreme Court was reversing – had applied "the three-part test of *Lemon v. Kurtzman* . . . [and] held that the chaplaincy practice violated all three elements of the test . . . ." *Marsh*, 463 U.S. at 786.))

In its recent decision in *Sante Fe Independent School Dist. v. Doe*, 530 U.S. 290, 120 S. Ct. 2266 (2000), according to the justices who dissented in that case, the Court "applies the most rigid version of the oft-criticized test of *Lemon v. Kurtzman* . . . ." *Id.*, 120 S. Ct. at 2284 (Rehnquist, C.J., dissenting). And in a case decided a few days later, *Mitchell v. Helms*, 120 S. Ct. 2530 (2000), the Court again applied the *Lemon* test, albeit with a modification (introduced by *Agostini v. Felton*, 521 U.S. 203 (1997)) for aid-to-education situations. See *Mitchell*, 120 S. Ct. at 2540. Perhaps the Supreme Court will soon have an opportunity to tell us, if it wishes, whether the *Lemon* test applies here as well, or whether this case is governed by the endorsement test, or the *Marsh* test, or some combination of some or all of the various tests on offer.

---

guide in this difficult area." *Id.* Justice O'Connor has repeatedly indicated a preference for the endorsement test, noting the "difficulties inherent in the Court's use of the test articulated in *Lemon.*" *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 347-48 (1987) (O'Connor, J., concurring). The Chief Justice has said that he sees "little use" in the *Lemon* test, a test that in his view "has no basis in the history of the Amendment it seeks to interpret, is difficult to apply and yields unprincipled results . . . ." *Wallace v. Jaffree*, 472 U.S. 38, 112 (1985) (Rehnquist, C.J., dissenting). Justices Scalia and Thomas have likewise been sour on *Lemon.* See *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J. (joined by Thomas, J.) concurring).

it. Modern scholars do not believe that everything attributed to Jesus was in fact spoken or done by him. The Gospels are the literary creations of early Christian communities. The genre is very different from biography or history. It is a literary form that allows for creative interpretation of the oral and written traditions about Jesus that were available. Furthermore, if Jesus did speak these words, we must keep in mind that he was a Jewish rabbi in a Hellenistic world who drew on Hebraic thought that had been reinterpreted in light of the classical tradition of Greece noted in paragraph two above. *In other words, he was not saying anything new when he said, 'With God all things are possible.' He was simply using a proverbial phrase that was commonly known and accepted as true.*" (Emphasis supplied.)

Professor Thomas P. Kasulis (see note 12, *supra*), whose area of specialization is the comparative philosophy of religion, confirms in his affidavit that "the statement 'With God all things are possible' does not express an idea limited to a single tradition." Professor Kasulis quotes numerous passages from the Hebrew Bible and the Muslim Qur'an in which similar ideas are presented, after which the professor continues as follows:

"This continuity among the traditions of Judaism, Christianity and Islam is not surprising since they are all monotheistic traditions with common Semitic culture roots. Yet, even when we look at religious texts from a non-Semitic religion like Hinduism, we find a similar idea."

Professor Kasulis then quotes passages from the Hindu *Upanishads* and the Egyptian *Akhenaten's Hymn to Aten* (the latter written almost a millennium and a half before the Christian era) to demonstrate that the idea of an all-powerful God was not confined to Semitic religions such as Judaism, Christianity, and Islam.

Finally, if we may be forgiven yet another extensive quotation, Professor Kasulis offers these highly pertinent thoughts:

"12.  I see the motto as primarily exhortative rather than referential.  First, it does not offer a stipulative definition for the concept of God that would establish one religious interpretation over all others.  As suggested by the quotes cited in sections 3 and 4 above, for theistic religions, non-Christian as well as Christian, God is typically conceived as omnipotent.  That characteristic is in most dictionary definitions of 'God' as well.  Second, for a nonreligious philosophical understanding, the assertion is almost tautologically true.  In fact, for Aristotle, who has been very influential in the conceptual understanding of the term 'God' in Western culture, it is tautological.  According to him, God is what attracts all things to realize their potential; God and the actualization of possibility are logically inseparable.    The near tautological nature of the statement in both religious and nonreligious contexts suggests the motto is meant to inspire rather than proclaim or define.  It is typologically similar to Yogi Berra's tautological aphorism, 'It's never [sic] over until it's over.'  The function of that statement was to urge his players to keep their sights on victory even though it didn't seem to them possible at the time.  He was not making an assertion that would be new to them, nor one with which some could logically disagree.  Rather, he was boosting their morale, instilling confidence and optimism, exhorting them not to give up and to continue to strive.

\* \* \*

"14.  That the phrase 'With God all things are possible' is found in the Christian New Testament does not itself mean the phrase is advocating a particular religious institution.  The Bible has become a moral as well as religious resource of insights in our Western culture.  The

Bible is liberally quoted in all sorts of contexts that are not explicitly religious.  People commonly refer to 'turning the other cheek,' 'loving your enemies,' 'to everything there is a season,' 'the love of money is the root of all evil.'  These phrases express ideas about personal and social life having inspirational connotations for many people regardless of their religious commitments.  For example, though not a Christian, the young Mohandas Gandhi was inspired by Jesus' Sermon on the Mount and used its ideas in formulating his own theory of nonviolent resistance as a means to social justice.  Gandhi did not accept Jesus as Lord and Savior, but he was politically or morally moved by Jesus' words.  That is a good instance of how the Bible can inspire without advocating a particular religious point of view."

Like the district court, we take this testimony to be that of a reasonable observer who speaks with some authority on a subject in which he happens to be exceptionally well versed.  And what the professor's testimony shows  –  to our satisfaction, at least  –  is that no well informed observer could reasonably take Ohio's motto to be an official endorsement of the Christian religion.

But this fact may not be dispositive of the case either.  The reason it may not be dispositive is that the "endorsement test" does not appear to have totally supplanted the well-known test derived from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), notwithstanding that five of the current members of the Supreme Court have, on different occasions, expressed reservations about the *Lemon* test.[15]  (It is worth mentioning,

---

[15] Justice Kennedy has noted that the Supreme Court's decisions "often question [the *Lemon* test's] utility in providing concrete answers to Establishment Clause questions," adding that "substantial revision" of the test "may be in order."  *Allegheny County v. American Civil Liberties Union*, 492 U.S. 573, 655-56 (1989) (Kennedy, J., concurring in part and dissenting in part).  Justice Kennedy has further said that he "does not wish to be seen as advocating, let alone adopting, that test as our primary